UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| *ex rel.* ) | |
| DR. WILLIAM MESHEL and ) | |
| DR. MAN TAI LAM, ) | |
| ) | |
| Relators, ) | |
| ) | |
| v. ) | Civil Action No. EP-02-CA-0525 |
| ) | Honorable Kathleen Cardone |
| TENET HEALTHCARE CORPORATION, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## THIRD AMENDED COMPLAINT

1.      This is an action for monetary damages brought pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §3729 *et seq.*  Relators Dr. William Meshel and Dr. Man Tai Lam seek on behalf of plaintiff the United States of America damages for fraud and other improper practices of defendant Tenet Healthcare Corporation in connection with federally-funded health care programs.

### Jurisdiction and Venue

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3730(b).  Venue properly lies in this District pursuant to 28 U.S.C. §1391(b) inasmuch as defendant is a resident of this District, and a substantial portion of the events giving rise to this action occurred in this District.

### Parties

3.      Plaintiff in this action is the United States of America, on whose behalf relators bring their claims.

4.      Relator Dr. William Meshel is a licensed physician who, at all times relevant to this action, has resided and practiced medicine in the City and County of El Paso, Texas.

5.      Relator Dr. Man Tai Lam is a licensed physician who, at all times relevant to this action, has resided and practiced medicine in the City and County of El Paso, Texas.

6.      Pursuant to 31 U.S.C. §3730(a)(2), relators have provided to the Attorney General of the United States and the United States Attorney for this District a written statement of material evidence to support the allegations set forth herein.

7.      Defendant Tenet Healthcare Corporation is a resident of this District in that it transacts business therein through, *inter alia*, the operation of two health care facilities known as Providence Memorial Hospital ("Providence") and Sierra Medical Center ("Sierra").

## Statement of the Case

8.      Dr. William Meshel is a 1971 graduate of Howard University College of Medicine and has practiced in the El Paso area since 1998, concentrating on internal medicine and emergency medicine.  Until December 2002, Dr. Meshel had privileges at several hospitals in El Paso, including Providence and Sierra.  Since December 2002, he has maintained privileges at, and an ownership interest in, Southwestern General Hospital ("Southwestern").

9.      Dr. Man Tai Lam graduated from the National Defense Medical Center in Taipei in 1973, and has practiced medicine in El Paso since 1979.  Throughout his career in El Paso, Dr. Lam has been involved in hospital administration and management.  Dr. Lam helped to create Southwestern, in which he holds an ownership interest.  Dr. Lam also serves as a Managing Partner and Chief of Staff at Southwestern.

10.     Dr. Lam holds appointments at numerous other El Paso area hospitals, including *inter alia* Providence Memorial, Sierra Medical Center, and Del Sol Medical Center.  From 1989 to 1992 Dr. Lam served on the Medical Executive Committee of Providence Hospital, the highest governing body for the medical staff of that facility.

Third Amended
Complaint

2

## The Outlier Scheme

11.    By virtue of his management positions at the above-named facilities, Dr. Lam knew that Providence Memorial Hospital and Sierra Medical Center were earning substantially higher profits than Southwestern. Dr. Lam knew that the Tenet hospitals listed much higher charges on their charge master, the hospital's published list of fees for various services, than did Southwestern, but he also knew that generally reimbursement by the United States for particular Diagnosis Related Groups (DRGs) was for a fixed amount irrespective of the figure stated on a facility's chargemaster.

12.    As a member of the Providence Hospital Medical Executive Committee, Dr. Lam had been briefed on the outlier component of the Medicare reimbursement system. When he subsequently came to learn of the differences in profits between the Tenet hospitals and Southwestern, however, he did not immediately recognize how increases in charge master prices affected reimbursement for outliers.

13.    Patients that Dr. Lam or Dr. Meshel had treated at Providence or Sierra had on numerous occasions complained to them about bills they received for services at either of these facilities.

14.    In January or early February 20, 2002, Dr. Meshel met with FBI Agents Steven Sylvester and Robin Skillington to discuss his observations of Tenet's charging practices. He related what he and Dr. Lam had found both with respect to the payment of kickbacks under the guise of "medical director fees" and evidence of extremely high charges for certain DRGs.

15.    The information conveyed by Dr. Meshel was a product of personal observations and discussions with Dr. Lam. Prior to meeting with the FBI Agents, the doctors had met in the physician's lounge of Del Sol Hospital and exchanged information regarding Tenet's practices with respect to medical directorships and very high DRG charges, all in the context of noting the substantially higher profits earned by the Tenet facilities in comparison to Southwestern. Also

Third Amended
Complaint

3

prior to the meeting with the FBI Agents, Dr. Lam had discussed Tenet's charging policies, and specifically the very high charges associated with certain DRGs, with Mr. David Buchmueller, who had been hired to serve as the Administrator of Southwestern after working a number of years in El Paso-area Tenet hospitals. Dr. Lam and Mr. Buchmueller specifically discussed, for example, the fact that Tenet's charge for the DRG associated with treatment of congestive heart failure was two to three times higher than Southwestern's. Dr. Lam and Mr. Buchmueller observed that these dramatically higher charges tended to coincide with procedures for which patient stays exceeded 21 days.

16. On or about April 16, 2002, Dr. Meshel met again with FBI Agents Sylvester and/or Skillington, and Agent Thomas Murray, with whom Dr. Meshel had not previously discussed Tenet's practices. Agent Murray described his experience in an investigation of Columbia Hospital Corporation. Dr. Meshel again explained Tenet's misuse of medical director fees and the overcharges associated with certain DRGs. Agent Murray responded that the case might be difficult to prove because the physicians could claim they spent time at home working on matters related to their positions as medical directors. Dr. Meshel was disappointed at this reaction, but continued to gather information. He had additional meetings with Agent Murray and/or Agents Sylvester and Skillington from April through August, 2002, during which he discussed Tenet's charging practices.

17. In July 2002, David Buchmueller became Administrator of Southwestern, after having served in similar capacities at Tenet facilities in the El Paso area. In conversations with Dr. Meshel and Dr. Lam, Mr. Buchmueller stated that Providence and Sierra were "Holiday Inns" charging "Four Seasons" prices. These statements were consistent with the prior observations of Dr. Meshel and Dr. Lam concerning Tenet's charging policies.

18. Mr. Buchmueller explained to Dr. Meshel how the Medicare outlier reimbursement process worked. He gave Dr. Meshel a book that compared national DRG

charges for five common DRGs.  The book confirmed what Dr. Meshel and Dr. Lam had suspected—that the charges at Providence and Sierra for these DRGs were extraordinarily high. Their existing knowledge of the Medicare reimbursement process enabled them to determine that the extremely high DRG charges were specifically designed to enhance outlier payments.

19.     In September 2002, Dr. Meshel met with Agent Murray and presented him with the results of the analysis that he and Dr. Lam had performed after reviewing Mr. Buchmueller's book. Agent Murray stated that his wife was an FBI analyst, and might be interested in the issue. Dr. Meshel provided Agent Murray with some printed articles concerning outliers sometime in October, as an educational aid.

20.     Dr. Meshel met subsequently with Agent Murray on multiple occasions in September and October and discussed further Tenet's outlier practices.   These visits occurred at the FBI office in El Paso and, on one occasion, at Southwestern, during which discussion Dr. Meshel provided to Agent Murray the book given to him by Dr. Buchmueller concerning DRG charges.

21.     Dr. Meshel summarized his previous reports and conversations to the FBI Agents in two email messages to Agent Sylvester dated November 14, 2002.  The information in these email messages had been provided to Agent Sylvester and/or Agents Skillington or Murray prior to October 28, 2002.  In these messages, Dr. Meshel recapped his previous information indicating that the average outlier payments to hospitals in El Paso was five percent of total Medicare reimbursement, but for Sierra and Providence the return was 25 percent.  In his email message, Dr. Meshel included the following specific comparisons of charges at hospitals in El Paso and elsewhere:

DRG 127 – Heart Failure and Shock

| | |
|---|---|
| Sierra Medical Center | $25,508 |
| Providence Hospital | 21,474 |
| Columbia Medical (West) | 18,382 |

Third Amended
Complaint

| | |
|---|---|
| Columbia Medical (East) | 16,491 |
| Southwestern | 12,241 |
| Memorial Hospital (Houston) | 11,942 |
| Methodist Hospital (Houston) | 11,626 |
| R.E. Thomason General | 8,151 |

DRG 296 – Nutritional and metabolic orders, age > 17

| | |
|---|---|
| Providence | $18,057 |
| Sierra | 17,815 |
| South Austin Hospital (Austin) | 9,312 |
| Southwestern | 9,154 |
| Northwest Regional (Corpus Christi) | 8,170 |

DRG 089 – Simple pneumonia and pleurisy, age > 17

| | |
|---|---|
| Sierra | $24,101 |
| Providence | 20,837 |
| Columbia West | 17,297 |
| Columbia East | 16,021 |
| Southwestern | 13,168 |
| R.E. Thomason | 10,441 |

Dr. Meshel explained that the pattern discernible from the foregoing examples persisted throughout the published DRGs. He noted, for example, that Sierra's charge for the DRG corresponding to Congestive Heart Failure/Pneumonia was two to three times higher than that of the Mayo Clinic.

22.    Medicare, established at Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, is the federally funded program that provides health insurance to the aged and disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the U.S. Department of Health and Human Services ("HHS") and serves more than 40 million beneficiaries.

23.    Medicare's hospital insurance program, known as "Part A," provides benefits covering inpatient hospital services. Hospitals participating in the Medicare program operate under a contract known as a "provider agreement" with CMS. In these provider agreements,

each hospital certifies that it will adhere to Medicare laws, regulations and program instructions. CMS Form 855A at 51.

24.    CMS withholds 5.1% from the payments each hospital would otherwise have received for treating hospitalized Medicare patients to fund a common pool or trust account (the "Outlier Pool"). When a hospital incurs costs to treat a severely ill Medicare patient that far exceed the amount the hospital would be paid under normal Medicare reimbursement guidelines, it may be eligible to receive compensation from the Outlier Pool.

25.    In 1983, CMS implemented an Inpatient Prospective Payment System ("PPS"), which issues prospectively determined payments based upon the diagnosis of a given patient; not based on the actual length of stay or the amount of services provided to each patient.

26.    Under the PPS, the Medicare program, CMS has created approximately 520 diagnosis related groups ("DRG's") to which Medicare has assigned a numeric rate reflecting the resources needed, on average, to treat a patient with the corresponding diagnosis. A hospital's reimbursement for treating a specific patient is determined by applying the numeric weight for that DRG by a standardized amount based on the average resources used to treat cases in all DRG's adjusted for regional wage rates and other factors. At the outset of each fiscal year, HHS publishes the weights and values that will be factored into the PPS calculation. 42 U.S.C. § 1395ww(d)(6).

27.    The Medicare program accommodates cases where hospitalization is extraordinarily costly, lengthy or difficult through the Outlier Pool. 42 U.S.C. § 1395ww(d)(5)(A). A hospital can qualify for outlier payments when its cost-adjusted charges exceed either a fixed multiple of the applicable DRG rate or a fixed dollar amount established by HHS, the "Outlier Threshold." 42 U.S.C. § 1395ww(d)(5)(A)(ii). The Outlier payment is meant to "approximate the marginal cost of care." 42 U.S.C. §1395ww(d)(5)(A)(iii).

28.     All hospitals, including Tenet hospitals, use a so-called "charge master" which specifies the charges for each item or service the hospital provides.  For example, a hospital's charge-master might list a charge for a bandage at $7.00, a hospital room at $700 per day, or use of an operating room for a lengthy surgical procedure at $7,000.

29.     The Outlier system is based on the costs that a hospital incurs to treat a specific Medicare patient.  The hospital's charges can act as a surrogate for its costs if there is a rational relationship between the two.  Each hospital, including Tenet hospitals, has a "cost to charge ratio" or "CCR."  The CCR, which is an average, can be used to transform a charge into a cost.  For example, if a hospital's CCR is 0.75 and its charges for a particular patient are $10,000, then its approximate cost to treat that patient would be $7,500.  In the Outlier system, CMS requires that a hospital's charges be reasonably and consistently related to its cost of providing particular services.  "Implicit in the use of charges as the basis for apportionment is the objective that charges for services be related to the cost of the services." 42 C.F.R. §413.53(b)(2)(ii).

30.     The Outlier payment is 80% of the difference between the hospital's costs for treating a patient (calculated by adjusting its charges by its CCR), less the sum of the PPS payment and the Outlier Threshold.  Thus: Outlier Payment =.8 x [(Charges x CCR) – PPS Payment – Outlier Threshold]   In this equation, charges are the hospital's charges (indicated in the charge-master) for services provided to the patient; the CCR is derived from the hospital's latest "Settled Cost Report"; the PPS payment is the standard DRG payment; and the Outlier Threshold is the amount established annually by CMS.

31.     Tenet improperly manipulated the Outlier system by artificially inflating its charges when its real costs remained constant or even declined.  By inflating their billed charges, Tenet transformed ordinary or average-cost PPS patients into Outlier patients, even though the costs actually incurred by the hospitals to treat those patients fell within the norm and therefore would not entitle the hospital to receive Outlier payments.  By artificially increasing their billed

charges, the Tenet hospitals represented to CMS that their costs had similarly increased. When Tenet facilities inflated their charges, their apparent "costs" (computed using CCRs that predated the charge increases), dramatically increased as well.

32.     For example, assume that in 2003 a hospital's latest CCR (calculated from its 2000 cost report) was 0.5. If that hospital decided to double its charges even though its costs had not increased, its "true" CCR would be 0.25. Suppose a patient incurred $100,000 in charges for a hospitalization (which earlier would have been $50,000) and the hospital received a PPS payment of $25,000. The hospital's actual costs to treat that patient would be $25,000 (0.25 x $100,000). However, if the artificially doubled charge ($100,000) was multiplied by the applicable CCR from its 2000 cost report (0.5), the apparent cost of treating the patient would be $50,000, double the actual cost. The true cost ($25,000) would never qualify for the Outlier system, but the artificially inflated cost ($50,000) certainly would.

33.  By artificially increasing charges, Tenet artificially increased its apparent costs and thereby qualified for Outlier payments to which it otherwise would not have been entitled.

### Kickbacks in the Guise of "Medical Directorships" And Reimbursement of Business Expenses

34.     Dr. Meshel and Dr. Lam came to learn, through personal observation and inquiry, that Tenet paid substantial sums to individual physicians to cover the costs of rent, office staff, telephones and similar business expenses. Additionally, Tenet paid still more to certain physicians for service as "medical directors" when, in actuality, no services were rendered in exchange for these payments.

35.     In their January 2002 meeting in the Del Sol Hospital physician's lounge, Dr. Lam stated to Dr. Meshel that he had discovered that Tenet was using the appointment of medical directorships as a means to induce patient referrals. Dr. Lam further stated that other payments, for rent, office staff and similar expenses, were being made by Tenet for the same

goal. These statements were made in the context of discussing, as noted in ¶15, *supra,* the higher profit margins that Tenet was earning relative to Southwestern.

36.    Subsequent to this meeting, Dr. Meshel proceeded with his own inquiry.  By February 17, 2002, he had developed sufficient information to report to FBI Agent Sylvester.  In an email message of that date, Dr. Meshel advised Agent Sylvester that through his inquiries Dr. Meshel had learned that the chief of a particular service should earn no more than $200-300 per hour in performing duties associated with such a position.  In a separate message the following day, Dr. Meshel reported to Agent Sylvester that he had been informed that three oncologists and an infectious disease specialist were receiving kickbacks from Tenet; one had specifically claimed to be receiving $120,000 per year since the 1980s for what Dr. Meshel's source described as "doing nothing."

37.    Dr. Lam, upon being apprised of the information noted in ¶24, *supra,* noted that the four physicians were in the same practice group, and consequently the total sum being paid by Tenet to that group was extremely large.  Dr. Meshel related this to Agent Sylvester by email dated February 18, 2002, and noted all of these payments were being identified as expenses on the hospitals' cost reports.

38.    On or about April 16, 2002, Dr. Meshel met with Agent Sylvester and/or Agent Skillington, along with Agent Murray (*see* ¶16, *supra*).  Dr. Meshel explained what he and Dr. Lam had uncovered regarding medical directorships and other payments to induce patient referrals.  Notwithstanding an initial negative response by Agent Murray, Dr. Meshel continued his investigation.

39.    Also on April 16, 2002, Dr. Meshel transmitted to Agent Sylvester an email message summarizing what he had reported in their meeting.  He stated that he had learned of kickback payments from a physician who had previously been part of the oncology group referred to in ¶¶24-25, *supra*.  Dr. Meshel identified, by name, five physicians in an oncology

Third Amended
Complaint

10

group who were receiving payments to induce patient referrals. Dr. Meshel further reported that the payments ranged from $60,000 to $120,000 per year for services that, in the case of at least the individual receiving $120,000, consisted of doing essentially nothing, *i.e.* presiding at one meeting per year. Dr. Meshel further informed Agent Sylvester that these individuals were referring a large number of their patients to Tenet facilities at remote locations from their office, notwithstanding the fact that Del Sol Hospital was across the street.

40.     In that same April 16, 2002 email, Dr. Meshel reported that four named members of a pulmonary group were receiving payments of $60,000 to $100,000 per year; that four surgeons were being paid for "medical directorships" for the past ten years, and that two obstetrician/gynecologists had been receiving $100,000 a year for the past seven years, all of which payments were far in excess of reasonable payment for services rendered, and were in fact for the purpose of inducing patient referrals.

41.     Dr. Meshel continued his investigation and reported his findings to Agent Sylvester on an ongoing basis. Thus, by email dated April 18, 2002, Dr. Meshel informed Agent Sylvester that four urologists, identified by name, had had rent, telephone, and office staff expenses paid by Tenet. On April 19, 2002, Dr. Meshel reported that the oncology group received rent-free office space from Tenet for six months following a move in 1999. And on April 28, 2002, Dr. Meshel reported that a medical building had been purchased by Tenet and leased back to its previous owners, both physicians, at a reduced rate.

42.     The payments described in the foregoing ¶¶22-29 were made for the specific purpose of inducing referrals of patients to Tenet hospitals by those physicians receiving the payments. These payments were made for the purpose of inducing referrals for services and/or items to be paid for by Medicare, Medicaid or other federal health care programs.

**COUNT ONE**

43.    The allegations contained in the foregoing paragraphs are incorporated as if fully set forth herein.

44.    In furtherance of the outlier scheme set forth in the foregoing paragraphs 11 through 33, defendant knowingly presented, or caused to be presented, to the Health Care Financing Administration and/or its successor, the Centers for Medicare and Medicaid Services, false and fraudulent claims for payment; and made or used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid, all in violation of 31 U.S.C. §3729(a)(1) and (2).

45.    As a result of the fraudulent scheme set forth in the foregoing paragraphs, defendant defrauded the United States of millions of dollars in payments to which defendant was not otherwise entitled.

**COUNT TWO**

46.    In furtherance of the kickback scheme set forth in the foregoing paragraphs 34 through 42, defendant made payments to physicians for the purpose of inducing referrals for services and/or items to be paid for by Medicare, Medicaid, or other federal health care programs, all in violation of the Anti-Kickback Act, 42 U.S.C. §1320a-7b(b).  By making claims for payment for these services, and/or including them in Medicare Part A Cost Reports, submitted to the Health Care Financing Administration or its successor the Centers for Medicare and Medicaid Services, defendant knowingly presented, or caused to be presented, false and fraudulent claims for payment; and made or used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid, all in violation of 31 U.S.C. §3729(a)(1) and (2).

47.    As a result of the kickback scheme set forth in the foregoing paragraphs, defendant defrauded the United States of millions of dollars in payments to which defendant was not otherwise entitled.

**WHEREFORE,** Man Tai Lam and William Meshel, acting on behalf of the United States of America, demand that defendant Tenet Healthcare Corporation pay the United States of America the penalty of not less than $5500 and not more than $11,000 per violation, three times the amount of damages that the United States of America has sustained because of the violation of the False Claims Act, plus litigation costs, reasonable attorney's fees, and such other and further relief as the Court deems just and proper.

## JURY DEMAND

Relators demand trial by jury on all issues so triable.

Respectfully submitted,

*ANTONIO V. SILVA, P.C.*

By: _____

Antonio V. Silva
State Bar No.: 18351350
N.M. Bar No.: 3769
2616 Montana Avenue
El Paso, Texas 79903
Telephone: (915) 564-5444
Facsimile: (915) 564-4413
E-mail: asilva@silvalawpc.com

**Of counsel ( pending
pro hac vice):**

*Troutman Sanders LLP*

By: Phillip Michael
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Phone: (212) 704-6000
Fax: (212) 704-6288

Third Amended
Complaint

13

**_Troutman Sanders LLP_**

By: Mark Nagle
    401 Ninth Street, NW
    Suite 1000
    Washington, D.C. 20004-2134
    Phone: (202) 274-2950
    Fax: (202) 274-2994


**_Law Offices of Stephen Meagher_**

By: Stephen L Meagher
    131 Steuart St
    San Francisco, CA 94105
    Phone: (415) 836-9000
    Email: slm@meagherlawoffices.com