# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION



| | |
|---|---|
| UNITED STATES OF AMERICA, et al<br><br>Plaintiff;<br><br>v.<br><br>TENET HEALTHCARE CORPORATION,<br><br>Defendant. | No. EP-02-CA-0525-KC |

## TENET HEALTHCARE CORPORATION'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND .................................................................................................. 2

III. THIS COURT LACKS SUBJECT-MATTER JURISDICTION
     OVER RELATORS' OUTLIER CLAIM ............................................................ 3

     A.   Legal Standard  for Subject Matter Jurisdiction under the False
          Claims Act .................................................................................................. 3

     B.   Relators' Outlier Claim Is Based Upon Publicly Disclosed
          Allegations Or Transactions ....................................................................... 5

          1.   Information Regarding Tenet's Allegedly Fraudulent
               Outlier Practices Was Publicly Disclosed Prior To The
               Filing Of This Lawsuit ........................................................................ 5

          2.   Relators' Outlier Claim Is "Based Upon" The Public
               Disclosures ......................................................................................... 9

     C.   Neither Relator Is An "Original Source" Of The Information On
          Which The Public Disclosure Of Tenet's Allegedly Fraudulent
          Outlier Claims Was Based ........................................................................ 11

          1.   Relators Have No "Direct And Independent" Knowledge
               Of The Publicly Disclosed Information ............................................ 11

          2.   Relators Did Not Voluntary Provide The Publicly
               Disclosed Information To The Government ...................................... 14

IV.  RELATOR'S ANTI-KICKBACK CLAIMS SHOULD BE DISMISSED
     FOR FAILURE TO SATISFY THE HEIGHTENED PLEADING
     REQUIREMENTS UNDER FRCP 9(B) ........................................................... 16

     A.   Legal Standard for Motion to Dismiss Pursuant to Federal Rule of
          Civil Procedure 9(b) ................................................................................. 16

     B.   The Heightened Pleading Standard of Rule 9(b) Applies to Claims
          Brought Under the False Claims Act ........................................................ 16

     C.   The Kickback Claim Fails to Meet the Heightened Requirements
          of Rule 9(b) .............................................................................................. 17

V.   CONCLUSION .................................................................................................. 22

## **TABLE OF AUTHORITIES**

**Page(s)**

### **FEDERAL CASES**

*Federal Recovery Services Inc. v. United States,*
  72 F.3d 447 (5th Cir. 1995) ...................................................................3, 4, 9, 10

*Frith v. Guardian Life Insurance Co. of America,*
  9 F. Supp. 2d 734 (S.D. Tex. 1998) .......................................................................19

*Shushany v. Allwaste, Inc.,*
  992 F.2d 517 (5th Cir. 1993) ...........................................................................16, 17

*Uni\*Quality, Inc. v. Infotronx, Inc.,*
  974 F.2d 918 (7th Cir. 1992) ...................................................................................18

*U.S. ex rel. Aflatooni v. Kitsap Phys. Services,*
  163 F.3d 516 (9th Cir. 1999) ..................................................................................13

*U.S. ex rel. Barlett v. Tyrone Hospital,*
  2006 WL. 221494 (W.D. Pa. Jan. 27, 2006)...........................................................18

*U.S. ex rel. Barrett v. Johnson Controls, Inc.,*
  No. 3:01-CV-1641-M, 2003 WL. 21500400 (N.D. Tex. Apr. 9, 2003) ...................10

*U.S. ex rel. Biddle v. Board of Trustees of Leland Stanford, Jr. University,*
  161 F.3d 533 (9th Cir. 1998) .............................................................................10, 11

*U.S. ex rel. Bledsoe v.Cmty. Health Sys., Inc,*
  342 F.3d 634, 643 (6th Cir. 2003) ..........................................................................19

*U.S. ex rel. Clausen v. Laboratories Corp. of America Inc.,*
  290 F.3d 1301 (11th Cir. 2002), *cert. denied,* 537 U.S. 1105 (2003).....................21

*U.S. ex rel. Dick v. Long Island Lighting Co.,*
  912 F.2d 13 (2d Cir. 1990)......................................................................................15

*U.S. ex rel. Doe v. John Doe Corp.,*
  960 F.2d 318 (2d Cir. 1992)...........................................................................3, 4, 10

*U.S. ex rel. Findley v. FPC-Boron Employees' Club,*
  105 F.3d 675 (D.C. Cir. 1997) (alteration in original).....................4, 9, 10, 11, 13, 14, 15, 16

*U.S. ex rel. Fine v. Sandia Corp.,* 70 F.3d 568 (10th Cir. 1995) .....................................9

*U.S. ex rel. King v. Alcon Laboratories, Inc.,*
  2005 WL. 20372 (N.D. Tex. 2005)................................................................18, 19, 20

*U.S. ex rel. Laird v. Lockheed Martin Engineering & Science Services Co.,*
  336 F.3d 346 (5th Cir. 2003) .........................................................................4, 11, 13

SD\524692.1

**Page(s)**

*U.S. ex rel. McKenzie v. BellSouth Telecommunications, Inc.,*
123 F.3d 935 (6th Cir. 1997) .......................................................................10, 14, 15

*U.S. ex rel. Obert-Hong v. Advocate Health Care,*
211 F. Supp. 2d 1045 (N.D. Ill. 2002) ...........................................................19, 21

*U.S. ex rel. Precision Co. v. Koch Industrial, Inc.,*
971 F.2d 548 (10th Cir. 1992) .................................................................................10

*U.S. ex rel. Reagan v. East Tex. Medical Ctr. Reg'l Healthcare System,*
274 F. Supp. 2d 824 (S.D. Tex. 2003) .......................................................................9

*U.S. ex rel. Reagan v. East Texas Medical Center Regional Healthcare System,*
384 F.3d 168 (5th Cir. 2004) .............................................................4, 10, 11, 13, 14

*U.S. ex rel. Russell v. Epic Healthcare Management Group,*
193 F.3d 304 (5th Cir. 1999) ......................................................................16, 17, 20

*U.S. ex rel. Settlemire v. District of Columbia,*
198 F.3d 913 (D.C. Cir. 1999) .................................................................................10

*U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn,*
14 F.3d 645 (D.C. Cir. 1994) ..............................................4, 9, 10, 11, 12, 14, 15

*U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Insurance Co.,*
944 F.2d 1149 (3rd Cir. 1991) .................................................................................13

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare, Inc.,*
125 F.3d 899 (5th Cir. 1997) ......................................................................16, 17, 18, 20

*U.S. ex rel. Wilkins v. North America Const. Corp.,*
173 F. Supp. 2d 601 (S.D. Tex. 2001) .....................................................................20

*U.S. ex rel. Willard v. Humana Health Plan of Tx., Inc.,*
336 F.3d 375 (5th Cir. 2003) ......................................................................17, 18, 19

*Wang v. FMC Corp.,*
975 F.2d 1412 (9th Cir. 1992) .................................................................................15

*Williams v. WMX Technologies., Inc.,*
112 F.3d 175 (5th Cir. 1997) ............................................................................16, 19

/ / /

/ / /

/ / /

/ / /

iii

**Page(s)**

## FEDERAL REGULATION & STATUTES

31 U.S.C. § 3729(a)(1).................................................................................................17

31 U.S.C. § 3730(e)(4)...................................................................3, 4, 9, 10, 11, 15

42 U.S.C. § 1320a-7b..................................................................................................17

68 Fed. Reg. 34,494 (June 9, 2003) .....................................................................5, 12

Fed. R. Civ. P. 8(a) ...............................................................................................16

Fed. R. Civ. P. 9(b) ...........................................................................................2, 16

SD\524692.1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, et al<br><br>Plaintiff,<br><br>v.<br><br>TENET HEALTHCARE CORPORATION,<br><br>Defendant. | No. EP-02-CA-0525-KC |

## TENET HEALTHCARE CORPORATION'S MOTION TO DISMISS

## I.

## INTRODUCTION

Relators Dr. Man Tai Lam ("Dr. Lam") and Dr. William Meshel ("Dr. Meshel") (collectively "Relators"), both of whom possess an ownership interest in a competitor hospital, allege that Tenet Healthcare Corporation ("Tenet") violated the False Claims Act by submitting fraudulent hospital payment claims in connection with federally-funded health care programs. Specifically, Relators assert that Tenet: (1) artificially inflated its "cost-to-charge" ratio to obtain more than its share of funds from the Medicare/Medicaid outlier system (the "Outlier claim"); and (2) offered medical directorships and office-expense reimbursements as "kickbacks" to induce physicians to refer their patients to Tenet hospitals (the "Kickback claim").

Relator's Outlier claim must be dismissed because the allegations and transactions underlying the claim were widely disclosed prior to November 18, 2002, when Relators filed their initial complaint, and Relators are not an "original source of the information" under Section 3730(e)(4) of the False Claims Act. Section 3730(e)(4) divests a court of subject-matter jurisdiction over any *qui tam* action in these circumstances.

Moreover, the Kickback claim must be dismissed for the failure to plead fraud with particularity as required under FRCP 9(b). Because the Kickback claim alleges fraud, it must describe the alleged fraud with sufficient detail to afford Tenet a meaningful opportunity to defend itself against such allegations. The Kickback claim fails to identify a single participating party, a single illegal referral, or a single claim that was falsely submitted as a result of the alleged kickback scheme.

## II.

## BACKGROUND

Drs. Lam and Meshel have practiced medicine in El Paso, Texas since 1979 and 1998, respectively. (Third Amended Complaint ("TAC") ¶¶ 8-9.) Throughout their careers, the two physicians have held appointments at a number of area hospitals, including Providence Memorial Hospital ("Providence") and Sierra Medical Center ("Sierra"), both of which are operated by Tenet. *Id.* ¶¶ 8, 10. From 1989-1992, Dr. Lam served on the Medical Executive Committee at Providence, the highest governing body for the medical staff at that facility. *Id.* ¶ 10. Since at least 2002, Relators have held an ownership interest in a Tenet-competitor facility, Southwestern General Hospital ("Southwestern"). *Id.* ¶¶ 8-9. Dr. Lam is co-founder of Southwestern and currently serves as Managing Partner and Chief of Staff. *Id.* ¶ 9.

By virtue of his previous management positions at Providence and Sierra, Dr. Lam alleges that he discovered that Tenet hospitals earned substantially higher profits than Southwestern. *Id.* ¶ 11. As a result, in early 2002, Relators began investigating Tenet's charging practices and referral procedures. *Id.* ¶ 14. As part of this investigation, Relators met with FBI Agents and periodically reported their findings to the government. *Id.* Although the government advised Relators early on that the case might be "difficult to prove," Relators nevertheless pursued their investigation throughout 2002. *Id.* ¶ 16.

On November 18, 2002, Relators filed a *qui tam* action on behalf of the United States government. The complaint was amended twice, the last time on December 12, 2005. In

2

July 2005, the government formally indicated its intention not to intervene, leaving Relators to pursue this action on their own.

In their first cause of action, the Outlier claim, Relators claim that Tenet "artificially inflate[ed] its charges when its real costs remained constant or even declined" so as to improperly manipulate payments from the Medicare/Medicaid outlier system. *Id.* ¶ 31. According to Relators, "by artificially inflating its charges when its costs remained the same, Tenet qualified for outlier payments to which it otherwise would not have been entitled." *Id.* ¶ 33.

In their second cause of action, the Kickback claim, Relators allege that Tenet developed a "kickback scheme" whereby it offered remuneration to physicians who referred patients to Tenet hospitals. *Id.* ¶ 46. According to Relators, such kickbacks included: (1) medical directorships at Tenet hospitals; and (2) reimbursement of office expenses. *Id.* ¶ 34.

### III.

### <u>THIS COURT LACKS SUBJECT-MATTER JURISDICTION OVER RELATORS' OUTLIER CLAIM</u>

**A.**    <u>Legal Standard  for Subject Matter Jurisdiction under the False Claims Act</u>

Section 3730(e)(4)(A) of the False Claims Act divests a court of subject-matter jurisdiction over any *qui tam* action based upon publicly disclosed allegations or transactions unless the relator is an "original source of the information." 31 U.S.C. § 3730(e)(4); *Federal Recovery Servs. Inc. v. U.S.*, 72 F.3d 447, 450 (5th Cir. 1995); *U.S. ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 322 (2d Cir. 1992). Specifically, Section 3730(e)(4)(A) provides:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

> (B) For purposes of this paragraph, "original source" means an
> individual who has direct and independent knowledge of the
> information on which the allegations are based and has voluntarily
> provided the information to the Government before filing an action
> under this section which is based on the information.

31 U.S.C. § 3730(e)(4).  In enacting these jurisdictional prerequisites, Congress carefully crafted

a jurisdictional bar to *qui tam* claims that are based on publicly disclosed information," based on

the recognition that there is little reason to induce would-be relators to come forward once

information about fraud has been made public.  *Doe*, 960 F.2d at 319.  The bar accordingly is

intended to deter "parasitic lawsuits by those who learn of the [alleged] fraud through public

channels and seek remuneration although they contributed nothing to the exposure of the fraud,"

unless the relator was an original source of the publicly disclosed information.  *Id.*; *U.S. ex rel.*

*Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 682 (D.C. Cir. 1997) ("'Congress sought

to limit *qui tam* actions "to those in which the relator has contributed significant independent

information [that is not already in the public domain].'") ((quoting *U.S. ex rel. Springfield*

*Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 653 (D.C. Cir. 1994)) (alteration in original).

Because in this case, information relating to Tenet's outlier practices was widely

disseminated prior to the filing of the complaint, Relators here must rebut a presumption that no

jurisdiction exists by establishing either (1) that their Outlier claim is not "based upon" publicly

disclosed allegations or transactions, or (2) if the Outlier claim is based upon public disclosure,

that Relators have "direct and independent knowledge of the information on which the

allegations are based," and are therefore an "original source" of the information.  31 U.S.C.

§ 3730(e)(4); *see, e.g.*, *Federal Recovery*, 72 F.3d at 450; *U.S. ex rel. Laird v. Lockheed Martin*

*Eng'g & Science Servs. Co.*, 336 F.3d 346, 352 (5th Cir. 2003); *U.S. ex rel. Reagan v. East Texas*

*Medical Center Regional Healthcare System*, 384 F.3d 168, 173 (5th Cir. 2004).  Relators cannot

meet that burden.

SD\524692.1

**B.**    **Relators' Outlier Claim Is Based Upon Publicly Disclosed Allegations Or Transactions**

1.    Information Regarding Tenet's Allegedly Fraudulent Outlier Practices Was Publicly Disclosed Prior To The Filing Of This Lawsuit

The public disclosure of Tenet's allegedly fraudulent outlier practices has been widespread and extensive—even if one limits the inquiry to the period preceding November 18, 2002, when Relators filed their original complaint in this case.[1] It began no later than October 28, 2002, when Kenneth Weakley, a stock analyst at UBS Warburg's Global Equity Research, issued a report (the "Weakley Report") that downgraded Tenet stock from "Hold" to "Reduce." Weakley Report at 1, *See* Ex. 1[2]. Weakley based his recommendation on "an analysis . . . that look[ed] at the topic of Medicare Outlier Payments" and revealed that Tenet's revenue growth and profitability were directly attributable to Tenet's rising Medicare outlier payments. *Id.* Weakley noted that Tenet's outlier payments "increased from less than 8% of inpatient Medicare base payments in FY00 to an estimated 23.5% for FY 2003," and significantly outpaced those of Tenet's main competitors. *Id.* at 1, 3.

Among the reasons Weakley cited as potentially accounting for the increase in Tenet's outlier payments was "significant increase in gross charges, which . . . are a significant component of the CMS outlier payment calculation." *Id.* at 4. Specifically, Weakley noted that "if gross charges are increasing at a rate that is significantly greater than the net charges over a relatively short amount of time (possibly by large increases in a hospital's chargemaster), outlier

---

[1]    The repercussions of the public revelation of Tenet's outlier practices were felt well after the filing of Relators' complaint. They included congressional hearings on outlier payments in 2003, *see, e.g., Medicare Outlier Payments to Hospitals: Hearing Before the Subcommittee on Labor, Health & Human Services and Education and Related Agencies of the House Committee on Appropriations*, 108th Cong. 8 (2003) (statement of Thomas A. Scully, Administrator, Centers for Medicare & Medicaid Services, Department of Health and Human Services), as well as revisions to HHS regulations governing outlier payments in the same year, 68 Fed. Reg. 34,494 (June 9, 2003).

[2]    Tenet requested that the Court take Judicial Notice of the Exhibits referenced herein. The Exhibits are attached to Tenet's Request for Judicial Notice In Support of it's Motion to Dismiss filed concurrently herewith.

SD\524692.1

payments will be skewed higher than normally would be the case." *Id.* The significant role outlier payments played with respect to Tenet's bottom line was a source of concern for Weakley due to changes to the regulatory environment he anticipated. "[T]he estimated growth in revenue and profitability resulting from rising Medicare outlier payments may be near an end," Weakley cautioned, in light of the fact that "the Department of Health and Human Services Office of Inspector General (OIG) [is] poised to divert some attention to the topic of outliers going forward," and "federal scrutiny of outliers will increase substantially over the next couple of years." *Id.* at 1.

The release of the Weakley Report had a dramatic effect on the price of Tenet shares. Between October 28 and 29, 2002, Tenet's stock price fell to $39.25, down nearly $10 from its closing prices of $49.31 on Friday, October 25, 2002. *See, e.g.*, Don Lee, *Tenet Shares Tumble 14% After Downgrade*, L.A. Times, Oct. 29, 2002, at 3:1, *See* Ex. 2; *Tenet Healthcare Shares Fall After Rating Is Cut*, N.Y. Times, Oct. 29, 2002, at C4 (reporting fall of Tenet shares due to Weakley's "concern about government health care reimbursements to Tenet"), *See* Ex. 3. Tenet shares lost 70 percent of their value in just over two weeks.

The Weakley Report also triggered a media avalanche that focused on, provided more details about, and acknowledged the possible existence of fraud in connection with, Tenet's outlier practices.[3] On October 29, 2002, for example, the *Los Angeles Times* reported that Tenet shares "were hammered . . . after an analyst downgraded the stock and raised questions about the . . . company's Medicare reimbursements." Don Lee, *Tenet Shares Tumble 14% After Downgrade*, L.A. Times, Oct. 29, 2002, at 3:1, *See* Ex. 2. The Weakley Report, the newspaper reported, "seemed to raise the specter of Medicare overbillings that have plagued big hospital companies in the past," and investors "were asking whether the company did something

---

[3]  A search of the "News, All" library on LEXIS for articles referencing Tenet and the Weakley Report between October 28, 2002 and November 28, 2002 yields at least 24 articles. A search for articles mentioning Tenet, fraud, and outlier payments for the same three-week time period yielded 70 articles.

intentionally to overstate hospital bills to maximize Medicare reimbursements." *Id.*  On November 11, 2002, the *Wall Street Journal* reported that Tenet's Chief Operating Officer "developed a policy to raise so-called chargemaster prices, a kind of health-care equivalent of the sticker price at car lots" that, while irrelevant to the amount private insurers or the government pays for services, are critical to calculating outlier payments.  Rhonda L. Rundle & Anna Wilde Mathews, *Tenet Reaped Outsize Gains From Flaw In Medicare System*, Wall St. J., Nov. 11, 2002, at A1 (hereinafter "*Tenet Reaped Outsize Gains*"), *See* Ex. 4.  On November 14, 2002, *TheStreet.com* in turn cited a California Nurses Association report that outlier payments at a Tenet hospital in Redding, California "are eight times the state average," and that "Tenet as a whole collects three times the national norm for such Medicare-funded procedures."  Melissa Davis, *Insider Sales Cloud Tenet Tale*, TheStreet.com, Nov. 14, 2002, at Stock News, *See* Ex. 5.

The Weakley Report also triggered a widely-reported investigation by the Office of Audit Services of HHS intended to audit outlier payments to Tenet hospitals.  CMS Administrator Thomas Scully announced that the investigation was intended to determine whether hospitals have "taken advantage" of the outlier regulations.[4]  Tenet shortly announced the departure of Tenet's Chief Operating Officer and Chief Financial Officer and acknowledged

---

[4]  *See, e.g.,* Reed Abelson, *U.S. To Review Big Payments For Medicare*, N.Y. Times, Nov. 13, 2002, at C1 ("[T]he government is reviewing what it pays to the other hospital systems to see whether they have taken advantage of Medicare rules to increase their reimbursements inappropriately," and is planning "a companywide audit [of Tenet] to make sure the payments were proper under Medicare rules."), *See* Ex. 6; Reed Abelson, *Tenet Faces Agency Audit Of Payments For Medicare*, N.Y. Times, Nov. 7, 2002, at C18 (reporting that DHS "contacted Tenet about performing an audit to make sure the [outlier] payments were appropriate, . . . and the agency will examine how the payments were calculated"), *See* Ex. 7; *Tenet's Lucrative Medicare Billing Seen At 3 Hospitals*, The Philadelphia Enquirer, Nov. 9, 2002, at C01 (reporting government audit of Tenet's outlier payments and that "analysts believe that the for-profit hospital company has been using an aggressive strategy to boost profits by maximizing outlier payments from Medicare"), *See* Ex. 8; Roger Yu, *Triad Falls On Tenet Trouble*, Dallas Morning News, Nov. 9, 2002, at 1F (reporting that "[t]he government plans to investigate allegations that Tenet bilked Medicare reimbursements"), *See* Ex. 9.

A LEXIS news search for articles referencing the government's audit of Tenet's outlier payments yields 97 articles for the one-week period preceding the filing of Relators' complaint.

that "aggressive" pricing had in fact increased the amount of outliers Tenet had received. *See, e.g.*, Reed Abelson, *Tenet Says It Will Review Price Strategy*, N.Y. Times, Nov. 8, 2002, at C1 ("Because [outlier] payments are partly calculated using hospital prices, Tenet's policy of increasing prices resulted in significant outlier payments, the company said."), *See* Ex. 10.

   Finally, as a result of these announcements and disclosures, numerous lawsuits were filed against Tenet in multiple jurisdictions. *See, e.g., Taub v. Tenet Healthcare Corp.*, No. 02-CV-8754 (S.D.N.Y.) (filed Nov. 1, 2002) (alleging that the Weakley Report placed Tenet "under a cloud of suspicion" and "put the Company in a position of having to prove the negative—that they did not commit Medicare fraud"), *See* Ex. 11, ¶10-11. In the Central District of California alone, for instance, no fewer than *nine* class action complaints against Tenet were filed before November 18, 2002.[5] These cases eventually were consolidated with others filed after that date, and a consolidated amended containing detailed allegations regarding "Tenet's abuse of Medicare outlier payments" was filed. Second Amended Complaint, *In re Tenet Healthcare Corp Securities Litigation*, Master File No. CV 02-8462 RSWL(RZx) (C.D. Cal.) (filed Jan. 15, 2004), *See* Ex. 12. Among its many allegations is one that mirrors the Relators' central complaint here: that "Tenet had implemented a strategy to raise its charges disproportionately from its costs in such a way as to receive material amounts of outlier payments for which it had not expended extraordinarily high costs." *Id.* ¶ 72.

---

[5]  *Newton v. Tenet Healthcare*, No. 2:02-cv-08462-RSWL-RZ (C.D. Cal.) (filed Nov. 4, 2002) (lead case); *Brannon v. Tenet Healthcare*, No. 2:02-cv-08553-RSWL-RZ (C.D. Cal.) (filed Nov. 6, 2002); *Stern v. Tenet Healthcare*, No. 2:02-cv-08638-RSWL-RZ (C.D. Cal.) (filed Nov. 12, 2002); *Goldstein v. Tenet Healthcare*, No. 2:02-cv-08702-RSWL-RZ (C.D. Cal.) (filed Nov. 13, 2002); *Rowe v. Tenet Healthcare*, No. 2:02-cv-08726-RSWL-RZ (C.D. Cal.) (filed Nov. 13. 2002); *Koenig v. Tenet Healthcare*, No. 2:02-cv-08727-RSWL-RZ (C.D. Cal.) (filed Nov. 14, 2002); *Sussman v. Tenet Healthcare*, No. 2:02-cv-08729-RSWL-RZ (C.D. Cal.) (filed Nov. 14, 2002); *Rose v. Tenet Healthcare*, No. 2:02-cv-08791-RSWL-RZ (C.D. Cal.) (filed Nov. 15, 2002).

2.    <u>Relators' Outlier Claim Is "Based Upon" The Public Disclosures</u>

There can be no dispute that these disclosures constituted a public disclosure under Section 3730(e)(4) of information relating to Relators' outlier claim, which, distilled to its essence, alleges that "Tenet improperly manipulated the Outlier system by artificially inflating its charges when its real costs remained constant or even declined." TAC ¶ 31; *See, e.g.*, 31 U.S.C. § 3730(e)(4)(A) ("No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions . . . from the news media . . . ."); *Recovery Serv.*, 72 F.3d at 450 ("Any information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure of allegations in a civil hearing for purposes of Section 3730(e)(4)(A).") (internal quotation marks omitted). The information contained in the Weakley Report, the numerous news reports, the disclosure regarding the government's audit of Tenet's outlier practices, and the allegations contained in the class action complaints filed against Tenet qualify as public disclosures of "the allegation of fraud or the critical elements of the fraudulent transaction themselves" that underlie Relators' outlier claim. *Springfield Term.*, 14 F.3d at 654. These disclosures also "raise[d] the specter of 'foul play'" by questioning the legality of obtaining outlier payments through increasing charges at a rate exceeding any increase in the actual cost of providing services. *Findley*, 105 F.3d at 687. They accordingly were sufficient to put the federal government on notice of the alleged fraud and qualify as "public disclosures" of the allegations and transactions at issue here. *See U.S. ex rel. Reagan v. East Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 843 (S.D. Tex. 2003).[6]

---

[6]    The fact that the disclosures may not have named the specific hospitals to which Relators' allegations of overcharging and outlier-payment maximization applied is immaterial, because there was sufficient information publicly disclosed to alert the government to the potential that the two hospitals Relators examined were involved. *See e.g., Finley*, 105 F.3d at 687 (jurisdictional bar applies where the complaint contains "allegations which substantially repeat what the public already knows and add only the identity of particular [defendants] engaged in the questionable and previously documented generic practice."); *U.S. ex rel. Fine v. Sandia Corp.*, 70 F.3d 568 (10th Cir. 1995) (general disclosure of misappropriation of

9

Relators' outlier claim is also "based upon" these public disclosures under Section 3730(e)(4)(A). A *qui tam* suit is "based upon" a public disclosure when "the relator's complaint repeats what the public already knows, even though [he] had learned about the fraud independent of the public disclosures." *Findley*, 105 F.3d at 683. When a complaint "merely echoes publicly disclosed, allegedly fraudulent transactions that already enable the government to adequately investigate the case and to make a decision whether to prosecute, the public disclosure bar applies." *Id.* at 688; *Springfield Terminal*, 14 F.3d at 654. In this regard, a lawsuit is "based upon" a public disclosure if the allegations in the complaint are "supported by" or "substantially similar to" the publicly disclosed allegations or transactions. *See, e.g.*, *Doe*, 960 F.2d at 324; *U.S. ex rel. McKenzie v. BellSouth Telecommunications, Inc.*, 123 F.3d 935, 940–41 (6th Cir. 1997); *U.S. ex rel. Biddle v. Board of Trustees of Leland Stanford, Jr. University*, 161 F.3d 533, 536–50 (9th Cir. 1998); *U.S. ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 552 (10th Cir. 1992). Indeed, an FCA *qui tam* claim "'*even partly based upon* publicly disclosed allegations or transactions'" is deemed to be "based upon" the public disclosure. *Precision Co.*, 971 F.2d at 552–53 (emphasis added); *accord Federal Recovery Servs.*, 72 F.3d at 451; *Reagan*, 384 F.3d at 176.[7]

These principles compel the conclusion that that Relators' outlier claim is necessarily "based upon" information about allegations and transactions that had been "*actually divulged to strangers to the fraud*" and were in the "public domain." *Doe*, 960 F.2d at 322; *USA ex rel. Barrett v. Johnson Controls, Inc.*, No. 3:01-CV-1641-M, 2003 WL 21500400, at *5 (N.D. Tex. Apr. 9, 2003). This is precisely the nature of Relators' outlier claim, which, fairly characterized, "merely echoes publicly disclosed, allegedly fraudulent transactions that already

---

nuclear waste funds at laboratories was a sufficient disclosure). "[A] relator's ability to reveal specific instances of fraud where the general practice has already been publicly disclosed is insufficient to prevent operation of the jurisdictional bar." *U.S. ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 919 (D.C. Cir. 1999).

[7]   The jurisdictional bar applies regardless of whether the relator actually bases his information from on the public disclosure. *Findley*, 105 F.3d at 683.

SD\524692.1

enable the government to adequately investigate the case and to make a decision whether to prosecute." *Findley*, 105 F.3d at 688. Relators "did not aid the government, for the government was already aware of the alleged fraud," *Biddle*, 161 F.3d at 540, and because "enough information exist[ed] in the public domain to expose the fraudulent transaction . . . or the allegation of fraud" at the time Relators filed their complaint in this case, *Springfield Terminal*, 14 F.3d at 654, Relators should not be allowed to proceed with their outlier claim unless they can demonstrate that they are an original source of the information.

**C.     Neither Relator Is An "Original Source" Of The Information On Which The Public Disclosure Of Tenet's Allegedly Fraudulent Outlier Claims Was Based**

Because Relators' outlier claim is based upon the public disclosure of allegations or transactions relating to Tenet's outlier practices, this Court lacks jurisdiction over the claim unless Relators can demonstrate that they are an "original source" of the information within the meaning of Section 3730(e)(4)(B). In this regard, Relators must demonstrate: (1) that they have "direct and independent knowledge" of the information on which the publicly disclosed allegations are based; and (2) that they have "voluntarily provided the information to the Government prior to filing the complaint." 31 U.S.C. § 3730(e)(4)(B); *Laird*, 336 F.3d at 352–55; *Reagan*, 384 F.3d at 176–77. As discussed below, they have failed to do so.

**1.     Relators Have No "Direct And Independent" Knowledge Of The Publicly Disclosed Information**

Relators have failed to demonstrate that they have both direct and independent knowledge of the information on which the public disclosures of Tenet's allegedly fraudulent outlier payments are based. *See, e.g., Laird*, 336 F.3d at 354–55; *Findley*, 105 F.3d at 690. The gravamen of the publicly disclosed allegations, and of Relators' outlier claim, is that "Tenet improperly manipulated the Outlier system by artificially inflating its charges when its real costs remained constant or even declined"—not that Tenet violated the False Claims Act by having

11

"extraordinarily high" charges.  TAC ¶ 31.[8]  The Complaint, however, contains *no* allegations even remotely suggesting that Relators had direct or independent knowledge of "*any* essential element of the underlying fraud transaction"—that is, information that Tenet had improperly manipulated the Outlier system or submitted false or fraudulent claims to the government. *Springfield Terminal*, 14 F.3d at 657.  Relators do not allege, for example, having had any direct or independent knowledge as to (1) whether "the costs actually incurred by the hospitals . . . fell within the norm and therefore would not entitle the hospital to receive Outlier payments," TAC ¶ 31; (2) whether Tenet "knowingly presented, or caused to be presented, to the Health Care Financing Administration and/or its successor, the Centers for Medicare and Medicaid Services, false and fraudulent claims for payment," *Id.* ¶ 44; (3) whether Tenet's billed charges were not in fact the charges reflected on its Charge Master; (4) whether the outlier payments Tenet received were calculated properly; or (5) whether the outlier payments Tenet received had a material effect on profitability.  Nor do Relators even allege that they were in a position to observe or know of these facts, or that they participated in, or at least were privy to, any internal processes through which Tenet's charges were determined.

Instead, Relators essentially make only two allegations: (1) that they determined through a review of Tenet's charges for services associated with certain DRGs—charges disclosed to each patient receiving the services and reported to the federal government—that those charges were on average higher for the two Tenet hospitals they examined than for other hospitals in El Paso; and (2) that "[t]heir existing knowledge of the Medicare reimbursement process enabled them to determine that the extremely high DRG charges were specifically designed to enhance outlier payments."  TAC ¶¶ 14, 16, 18–21.  That information, however, does

---

[8]    Indeed, the existence of high charges in itself is no violation of the law.  Nothing in the outlier regulations purports to limit a hospital's charges.  *See* 68 Fed. Reg. 34,494, 34,501 (June 9, 2003 ("Hospitals set their own level of charges and are able to change their charges, without review by their fiscal intermediaries."); Medicare Provider Manual § 2203 ("[T]he Medicare program cannot dictate to a provider what its charges or charge structure should be.").

not amount to direct or independent knowledge of the publicly disclosed information supporting the allegation that Tenet was fraudulently submitting outlier claims to the federal government.

First, Relators have failed to demonstrate "direct" knowledge because Relators' professed knowledge as to *any* essential element of their claim that Tenet's "extraordinarily high" charges were false or fraudulent under the False Claims Act was not "knowledge derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others." *Laird*, 336 F.3d at 355; *Reagan*, 384 F.3d at 177. As discussed above, the Complaint contains no allegation that Relators had "first-hand knowledge" of any of Tenet's alleged wrongdoing. *Findley*, 105 F.3d at 690. Instead, Relators allege only that they suspected, based on Tenet's charges for certain DRG-related services and their general knowledge about the Medicare reimbursement process, "that the extremely high DRG charges were specifically designed to enhance outlier payments." TAC ¶ 18.

The Fifth Circuit has previously held, however, that such a facile inference of fraud from information otherwise available to others or the government "does not qualify as 'information' under the original source exception." *Reagan*, 384 F.3d at 179–79 (rejecting contention that directness requirement is met where "[the relator's] research and expertise enabled her to recognize the significance of the limited information to which she was privy and thereby 'unearth' the knowledge that formed the basis of her claims"). As the Third Circuit has explained, "section 3730(e)(4) [was] designed to preclude *qui tam* suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator." *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1155–56 (3rd Cir. 1991); *U.S. ex rel. Aflatooni v. Kitsap Phys. Servs.*, 163 F.3d 516, 524–26 (9th Cir. 1999) ("[B]ecause the purpose of the FCA is to encourage individuals with true 'knowledge' of [the] alleged wrongdoing to come forward and provide such information to the Government, the purposes of the Act would not be served by allowing a relator to maintain a *qui tam* suit based on pure speculation or conjecture."). "A relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction

does not alter the fact that the material elements of the violation already have been publicly disclosed." *Findley*, 105 F.3d at 688.   "If a relator merely uses his or her unique expertise or training to conclude that the material elements already in the public domain constitute a false claim, then a *qui tam* action cannot proceed." *Springfield Terminal*, 14 F.3d at 655.  Because Relators' complaint contains no "direct" information concerning Tenet's outlier practices, and what Relators have learned is based on publicly disclosed information, Relators' outlier claim falls on the wrong side of the scale.

Second, Relators cannot demonstrate that their knowledge of these allegations was independent of and not "derived from the public disclosure." *See Reagan*, 384 F.3d at 177–78; *Findley*, 105 F.3d at 690; *McKenzie*, 123 F.3d at 941.  Taking the complaint's allegations as true, Relators possessed only information regarding Tenet's charges for services relating to certain DRGs prior to the public disclosure of information alleging that Tenet fraudulently obtained outlier payments.  Granted, Relators allegedly speculated that those charges "were specifically designed to enhance outlier payments," but they possessed no other information suggesting that Tenet's outlier claims were false or fraudulent.  TAC ¶ 18.  The Complaint otherwise attempts only to gloss over Relators' lack of independent knowledge by vaguely referring to Tenet's "charging policies" or "practices."  TAC ¶¶ 15, 16, 17 (each referring to "Tenet's charging policies"), 20 ("Tenet's outlier practices").  These allegations fall far short of the requisite demonstration of independent knowledge of information underlying the public disclosure.  It is clear that Relators "started with innocuous public information" and ended no farther; they failed to "complete[] the [fraud] equation with information independent of any preexisting public disclosure" and therefore were not an "original source" under Section 3730(e)(4)(B).  *Springfield Terminal*, 14 F.3d at 657.

      2.    <u>Relators Did Not Voluntary Provide The Publicly Disclosed Information To The Government</u>

Consistent with their lack of direct and independent knowledge of the information on which the public disclosures of Tenet's allegedly fraudulent outlier practices were based,

SD\524692.1

Relators cannot show that they voluntarily provided that information to the Government before the public disclosure. 31 U.S.C. § 3730(e)(4)(B); *see Findley*, 105 F.3d at 690 ("[A]n 'original source' must provide the government with the information prior to any public disclosure."); *McKenzie*, 123 F.3d at 942 ("[T]o be an original source, a relator must inform the government of the alleged fraud before the information has been publicly disclosed."). Nor have they demonstrated that they "played a part in publicly disclosing the allegations and information on which their suits were based." *Wang v. FMC Corp.*, 975 F.2d 1412, 1418 (9th Cir. 1992); *U.S. ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16 (2d Cir. 1990).

The complaint alleges only that during their meetings with FBI agents, Relators conveyed "evidence of extremely high charges for certain DRGs," "discussed Tenet's charging practices," and provided "some printed articles concerning outliers sometime in October, as an educational aid." TAC ¶ 14, 19.[9] Conspicuously absent are allegations showing that Relators provided the government information regarding *any* of the essential elements of the alleged fraud. There are no allegations showing that Relators provided the government information that "could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the *likelihood* of wrongdoing," discussed above. *Springfield Terminal*, 14 F.3d at 654 (emphasis added and internal quotation marks omitted). Instead, Relators clearly were no more "a 'source' to the government" of alleged wrongdoing than a person who reports to the police that her neighbor has bought an expensive new car, somehow smells something rotten, and otherwise provides the authorities only a copy of the criminal code. *Findley*, 105 F.3d at 690. This is clearly insufficient to allow a putative relator to proceed with a lawsuit on behalf of the government and to share in the government's recovery if

---

[9] Relators' vague account of the date on which they provided the articles to the FBI is unsurprising, in light of the indisputable fact that the Weakley Report came to light on October 28, 2002, and any information provided to the government after that date would have been too late.

it is later proved—through no effort of the relator—that the neighbor purchased the car as a result of some wrongdoing.

For all of these reasons, the Outlier claim fails to satisfy the jurisdiction requirements of the FCA, and the Court should dismiss the First Cause of Action with prejudice.

## IV.

## RELATOR'S ANTI-KICKBACK CLAIMS SHOULD BE DISMISSED FOR FAILURE TO SATISFY THE HEIGHTENED PLEADING REQUIREMENTS UNDER FRCP 9(B)

### A.    Legal Standard for Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 9(b)

The Federal Rules of Civil Procedure generally require the complaint to contain only a "short and plain statement" of the claims relied upon by the plaintiff. *See* Fed. R. Civ. P. 8(a). However, Rule 9(b) imposes a heightened degree of specificity for allegations of fraud. *See Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993). Specifically, Rule 9(b) requires that all averments of fraud be stated with "particularity." Fed. R. Civ. P. 9(b).

Because a determination of adequate particularity depends on the facts of each case, the Fifth Circuit has never articulated the requirements of Rule 9(b) in great detail. *Shushany*, 992 F.2d at 521. However, a plaintiff must specify — at a minimum — the "who, what, when, where, and how" of the alleged fraud. *Williams v. WMX Technologies., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997); *U.S. ex rel. Thompson v. Columbia/HCA Healthcare, Inc.*, 125 F.3d 899, 903 (5th Cir. 1997). Additionally, the Fifth Circuit has held that dismissal for failure to comply with Rule 9(b) is a dismissal on the pleadings for failure to state a claim. *U.S. ex rel. Russell v. Epic Healthcare Mgmt. Group*, 193 F.3d 304, 308 (5th Cir. 1999).

### B.    The Heightened Pleading Standard of Rule 9(b) Applies to Claims Brought Under the False Claims Act

As mentioned above, the allegations in the Complaint are brought pursuant to the *qui tam* provisions of the False Claims Act. TAC ¶ 1. The False Claims Act imposes liability on

"[a]ny person who . . . knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment." 31 U.S.C. § 3729(a)(1). In the Fifth Circuit, it is well established that all claims brought under the False Claims Act must adhere to the strict pleading requirements set forth in Rule 9(b). *U.S. ex rel. Willard v. Humana Health Plan of Tx., Inc.,* 336 F.3d 375, 384 (5th Cir. 2003); *Thompson,* 125 F.3d at 903. Specifically, Fifth Circuit precedent requires a plaintiff to allege the "particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Russell,* 193 F.3d at 308; *Shushan,* 992 F.2d at 521.

In their second cause of action, Relators contend that Tenet violated the False Claims Act by submitting claims for payment that were derived from illegal referral relationships in violation of the Anti-Kickback Statute. TAC ¶¶ 42, 46. The Anti-Kickback Act, codified at 42 U.S.C. § 1320a-7b, prohibits "(1) the solicitation or receipt of remuneration in return for referrals of Medicare patients, and (2) the offer or payment of remuneration to induce such referrals." *Thompson,* 125 F.3d at 901. In this case, Relators allege that Tenet offered medical directorships and reimbursement of office expenses as "kickbacks" to physicians in return for referrals to Tenet hospitals. TAC ¶ 34. With regard to medical directorships, Relators claim that Tenet paid certain physicians between $60,000 and $120,000 per year for "doing essentially nothing." *Id.* ¶ 39. Moreover, with regard to reimbursement of office expenses, Relators claim that Tenet offered favorable leases to certain physicians, paid for office staff, and even offered office space on a "rent-free" basis for six months. *Id.* ¶ 41.

## C.    The Kickback Claim Fails to Meet the Heightened Requirements of Rule 9(b)

As with all allegations of fraud, when bringing a *qui tam* action under the False Claims Act, a plaintiff/relator must specify the "who, what, when, where, and how" of the alleged fraud. *Thompson,* 125 F.3d at 903 (*citing Williams,* 112 F.3d at 179). In this case, when Relators' Kickback claim is analyzed under the "who, what where, when, how" rubric, it fails to

meet the heightened pleading requirement for *every element*. Instead, the TAC is merely a series of conclusory statements and unsubstantiated claims about Tenet's "schemes" to increase patient referrals. Specifically, with regard to the "kickback scheme," Relators fail to allege: (1) *who* offered or paid remuneration, and *who* referred patients to Tenet hospitals in exchange for kickbacks; (2) *where* such patients were referred; (3) the *date(s)* of the alleged referrals; (4) the *number* of alleged referrals; and (5) *how* any such referral ever resulted in the submission of a false claim for payment.

First, Relators fail to identify either the hospital employees or the physicians who allegedly violated the Anti-Kickback Statute by paying or accepting remuneration in exchange for patient referrals. Under Rule 9(b) a relator is required to clearly identify the person(s) involved in the alleged fraud, and failure to plead with specificity will result in dismissal of relators' claims. *See Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923-24 (7th Cir. 1992) (dismissing claims because plaintiff "[did] not even hint at the identity of those who made the misrepresentations); *see also U.S. ex rel. Barlett v. Tyrone Hospital, Inc.,* 2006 WL 221494 at \*7 (W.D. Pa. January 27, 2006, Slip Copy) (dismissing complaint for failure to include relevant information such as "the names of the specific doctors who made the referrals"). The Fifth Circuit has repeatedly dismissed suits brought under the False Claims Act for failing to identify the specific parties involved in the alleged fraud. *See, e.g., Thompson,* 125 F.3d at 903, (affirming the dismissal of a complaint under Rule 9(b) for failing to identify any specific physicians who referred patients); *U.S. ex rel. King v. Alcon Lab., Inc.,* 2005 WL 20372 (N.D. Tex. 2005) (noting that relator did not identify a single person involved in the alleged fraud); *Willard v. Humana Health Plan of Tx., Inc.,* 336 F.3d at 384 (requiring relator to include "the identity of the person making the misrepresentation and what that person obtained thereby").

Although Rule 9(b) requires specificity with regard to the parties involved in the alleged fraud, Relators fail to identify by name a single Tenet employee who allegedly paid remuneration to a physician with the intent to induce referrals. Similarly, Relators identify not a single physician who referred patients to Tenet hospitals as a result of any alleged inducement,

18

creating the "vague" and "indefensible" pleadings Rule 9(b) seeks to avoid. *See Frith v. Guardian Life Ins. Co. of America*, 9 F.Supp.2d 734, 742 (S.D. Tex. 1998); *U.S. ex rel. Obert-Hong v. Advocate Health Care*, 211 F.Supp.2d 1045, 1049 (N.D. Ill. 2002).

Second, Relators fail to identify the specific hospitals to which patients were referred in exchange for the alleged kickbacks. The Fifth Circuit requires relators to allege "the particulars of time, place, and content" with regard to allegations of fraud. *See Willard* (*citing Williams,* 112 F.3d at 179). Like the "who" requirement, the requirement that relators specify the location of any alleged fraud is designed to substantiate relators' claims and provide the defendant(s) notice of the alleged conduct. *See Frith*, 9 F.Supp.2d at 742.

In this case, Relators' allegations fall far short of the standard set forth in Rule 9(b). Relators merely allege that the physicians who allegedly received kickbacks referred a large number of their patients to "Tenet" facilities in "remote locations." However, Relators fail to specify where the referring physicians practiced, where their offices were located, and at which hospitals they held privileges. As a result, Tenet, and the Court for that matter, is left to ponder a multitude of rationales such physicians might have had for referring patients to a facility other than the one closest to their office(s).

Third, Relators provide absolutely no dates regarding allegedly illegal referrals obtained as a result of the supposed kickbacks paid by Tenet. The Fifth Circuit requires relators to identify the date(s) *on which a false claim was made for an alleged act of fraud. See King*, 2005 WL 20372 at *3 (citing *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003)). As a result, the *pertinent* dates in this case are: (1) dates on which referrals were made in exchange for remuneration, and (2) dates any such referrals resulted in false claims for payment to be submitted to the government. Because Relators have failed to set forth a single specific date on which an illegal referral was made or a false claim was submitted, they have failed yet again to meet Rule 9(b)'s standard.

Fourth, Relators' allegations fail to identify even one illegal referral made as a result of Tenet's "kickbacks." Although Relators allege that Tenet offered medical directorships

and reimbursement of office expenses "for the purpose of inducing" referrals, nowhere do they allege that any referrals were actually made as a result of such remuneration. *See* TAC ¶¶ 42, 46. Thus, while Relators allege a "kickback scheme," they fail to identify any false claim submitted to the government pursuant to such a scheme. *See Id.* ¶ 46. The Fifth Circuit has routinely held that a relator cannot merely allege fraudulent "schemes," as Relators do here. *King*, 2005 WL 20372 at *2; *Russell*, 193 F.3d at 308. Instead, Relators must allege with particularity: (1) the illegal referrals actually made, and (2) the false claims actually submitted as a result. *Thompson*, 125 F.3d at 903 (affirming dismissal of the complaint under 9(b) because relator did not identify any specific claims that were fraudulent); *U.S. ex rel. Wilkins v. North America Const. Corp.*, 173 F.Supp.2d 601, 641 (S.D. Tex. 2001) (finding the complaint incomplete because relator did not indicate what defendants had actually represented to the government). Relators' failure to identify even one illegal referral or false claim is a fatal blow to their case — without any allegation that at least one fraudulent claim was submitted to the government, Relators' TAC fails to comply with even the minimum requirements set forth in the False Claims Act.

Finally, Relators' claims do not adequately explain how the facts alleged, assumed as true, resulted in a fraud perpetrated on the government. *King*, 2005 WL 20372 at *3. The "how" requirement is crucial in cases, like this one, where the mechanism or basis of the fraud is not apparent from the face of the complaint. *Wilkins*, 173 F.Supp.2d at 616. In such cases, the Fifth Circuit requires a plaintiff/relator to explain precisely how the fraud worked. *Id.*

Importantly, the Anti-Kickback Statute does not prohibit Tenet from hiring physicians to act as medical directors, nor does it preclude such directors from making future referrals to Tenet hospitals, provided that the medical directorship did not serve as economic inducement for those referrals. *See Obert-Hong*, 211 F.Supp.2d at 1049. Similarly, the Anti-Kickback Statute does not prohibit Tenet from entering into leases with individual physicians, so long as the rental agreement is not remuneration for referrals. *Id.* Because neither medical directorships nor leasor/lessee relationships are prohibited *per se* by the Anti-Kickback Statute, Relators must do more than merely allege the existence of such promotions. Instead, the "how"

aspect of the pleading standard must explain how favorable leases and/or directorships resulted in illegally induced referrals. Relators fail in this respect —while the TAC repeatedly alleges that medical directorships and office expenses were made with the purpose of *inducing* referrals, it never alleges that such promotions in fact *resulted* in increased patient referrals to Tenet hospitals. In fact, the only reference to an actual referral is Relators' observation that *one* group of physicians "referred a large number of their patients to Tenet facilities at remote locations from their office" rather than to a hospital across the street. TAC ¶ 39. Because Relators do not identify the reasoning behind such referrals, they fail to connect the referrals to the "kickbacks" alleged elsewhere in the TAC. As a result, relators fail to meet this final requirement of Rule 9(b).

      In sum, the TAC fails to identify the relevant Tenet employees, physicians, dates, and hospitals, as well as how the alleged remuneration induced referrals and if such referrals ever actually resulted in the submission of false claims to the government. Instead, the TAC merely alleges a "scheme." As the Eleventh Circuit recently stated, "if Rule 9(b) is to carry water, it must mean that . . . essential allegation[s] and circumstance[s] of fraudulent conduct cannot be alleged in such conclusory fashion." *U.S. ex rel. Clausen v. Lab. Corp. of Am. Inc.*, 290 F.3d 1301, 1313 (11th Cir. 2002), *cert. denied*, 537 U.S. 1105 (2003).

      Because the second cause of action, the Kickback claim, on all accounts fails to meet the heightened pleading standard of Rule 9(b), it should be dismissed.

/ / /

/ / /

/ / /

/ / /

SD\524692.1

## V.

## CONCLUSION

For the reasons stated above, Tenet Healthcare Corporation respectfully requests that the

Court dismiss both causes of action alleged in the Third Amended Complaint with prejudice.

Dated:  February 24, 2006

Respectfully submitted,

**Scott, Hulse, Marshall, Feuille,
  Finger & Thurmond, P.C.**
P.O. Box 99123
El Paso, Texas  79999-9123
(915) 533-2493
(915) 546-8333 (Telecopier)

By: _____
**Joseph L. Hood, Jr.**
State Bar No. 09943250
Attorneys for Defendant
Tenet Healthcare Corporation

**Of Counsel (Pending Pro Hac Vice):**

**Roger Goldman**
**Latham & Watkins**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Phone Number: (202) 637-2200
Facsimile Number: (202) 637-2201
Roger.goldman@lw.com
District of Columbia State Bar No.: 333294
Attorneys for Defendant Tenet Healthcare Corporation

**Katherine A. Lauer**
**Latham & Watkins**
600 West Broadway, Suite 1800
San Diego, CA 92101
Phone Number: (619) 236-1234
Facsimile Number:  (619) 696-7419
Katherine.lauer@lw.com
California State Bar No.: 138010
Attorneys for Defendant Tenet Healthcare Corporation

SD\524692.1

### CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2006, a copy of the foregoing was served upon the following individual(s) in the manner(s) indicated below:

Antonio V. Silva  
Antonio V. Silva, P.C.  
2616 Montana Avenue  
El Paso, Texas  79903  
**Attorney for Relators Dr. William Meshel**  
**and Dr. Man Tai Lam**

    _X_   hand delivery  
    _____ certified mail, return receipt  
    _____ regular U.S. mail  
    _____ facsimile  
    _____ e-mail  
    _____ overnight delivery

Mitchell I. Weidenbach  
Assistant United States Attorney  
610 N.W. Loop 410, Suite 600  
San Antonio, Texas  78216-5512  
**Attorney for Plaintiff**  
**United States of America**

    _____ hand delivery  
    _____ certified mail, return receipt  
    _____ regular U.S. mail  
    _____ facsimile  
    _____ e-mail  
    _X_   overnight delivery

**Joseph L. Hood, Jr.**

SD\524692.1