UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

EL PASO DIVISION

| | | |
|---|---|---|
| U.S. ex rel. MESHEL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. EP-02-CA-0525 |
| | ) | |
| v. | ) | |
| | ) | |
| TENET HEALTHCARE CORPORATION | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' STATEMENT OF INTEREST

Pursuant to 28. U.S.C. § 517[1], the United States submits this Statement of Interest

("Statement") concerning the pending motion to dismiss filed by defendant, Tenet Healthcare

Corporation. This action was brought under the qui tam provisions of the False Claims Act, 31 U.S.C.

§ 3729 et seq. ("FCA"). Under the FCA, a relator may file suit on behalf of the United States and

receive a share of any recovery. After the suit is filed, the United States is entitled to at least 60 days to

determine whether to intervene in the action and take it over, or to decline intervention and allow the

relator to pursue the case. Here, the United States declined to intervene. Nevertheless, the United

States retains a significant interest in this proceeding. Although the United States has declined to

intervene, and is not a formal party, it remains the primary real party in interest. 31 U.S.C. §

3730(d)(2). Moreover, because the FCA plays a central role in the Government's ongoing efforts to

combat fraud, and because the United States pursues most of the successful actions under the FCA, the

United States has a keen interest in the proper interpretation of the FCA.

Most importantly, as discussed below, the United States had been investigating allegations that

---

[1]    This provision authorizes the Attorney General of the United States to attend to
the interests of the United States in any action in Federal or State court.

Tenet defrauded the United States in connection with its receipt of outlier payments well before the relators in this case filed suit. Accordingly, the United States has a keen interest in ensuring that these relators possessed actual knowledge of the alleged wrongdoing, and were not merely piggybacking on prior public disclosures when they filed suit.

In this case, the pending motion to dismiss and supporting memoranda filed by the defendant have raised issues regarding the proper interpretation of the FCA and the relevant case law. Hence, the United States now submits this Statement of Interest to elaborate or to clarify several points raised by the defendant. In submitting this Statement, the United States concurs with the defendant's position that the relators' outlier claims should be dismissed because they are barred by a prior public disclosure. The United States takes no position, however, on whether defendant's motion to dismiss relators' kickback allegations should be granted based on defendant's FRCP 9(b) argument.[2]

## BACKGROUND

### A.    The Outlier Program

The Medicare Trust Fund was established by Congress to protect the health of our aged and infirm. In most instances, the amounts that hospitals receive from the Medicare program for treating inpatients do not vary with the cost of treating the patient. Rather, Medicare reimburses hospitals a fixed amount of money for each patient stay as a result of the Diagnosis Related Group ("DRG") that has been assigned based on the patient's diagnosis and the procedures that the hospital has performed. In certain circumstances, however, Medicare does allow for the supplementation of DRG payments in light of the hospital's costs of care. To ensure that the hospitals possess the incentive to treat inpatients whose care requires unusually high costs, the Medicare program allows a portion of the Trust Fund to

---

[2]    If the Court requests the Government's presence at a hearing on the defendant's motion to dismiss, the Government is more than willing to appear and participate in the oral argument.

be used for "cost outlier" cases. It is these "cost outlier" payments that are at issue, in part, in this case.

In the governing statute, 42 U.S.C. §1395ww(d)(5)(A)(i)-(iv) ("Outlier Statute"), Congress authorized the Centers for Medicare & Medicaid Services ("CMS") to make "cost outlier" payments to hospitals – additional payments beyond the usual reimbursement amount – only where a hospital's "marginal cost of care" exceeds a particular threshold. 42 U.S.C. §1395ww(d)(5)(A)(iii). The Outlier Statute directs CMS to identify such cost outlier cases by adjusting a hospital's charges for an inpatient stay to reflect the hospital's costs for that stay. 42 U.S.C. §1395ww(d)(5)(ii). CMS implemented regulations complying with this directive that provided for outlier payments where a hospital's charges, multiplied by the hospital's ratio of costs to charges from its most recently settled cost report, exceeded a certain threshold. 42 C.F.R. §§412.80, 412.84.

Because it usually takes several years for a hospital's cost report to be settled, in applying the regulatory formula, CMS typically multiplied a hospital's current charges by the hospital's cost-to-charge ratio derived from a cost report for a prior year. Thus, if a hospital inflated its charges without a corresponding increase in costs, the inflated charges when multiplied by the hospital's historical cost-to-charge ratios would lead to artificially high "costs."

Accordingly, one of the key factors in assessing outlier allegations is a hospital's costs. High charges alone do not necessarily mean that a hospital's outlier payments were improper. Only if the hospital's charges were not reasonably related to its costs would a hospital's outlier payments be problematic. As discussed below, relators do not allege any knowledge of defendant's costs at any of its hospitals. Thus, they have no basis for alleging that defendant committed any outlier fraud.

**B.    The Government's Investigation**

The United States began investigating defendant's potential outlier abuse during the summer of 2002. The Department of Justice and Mutual of Omaha, the primary Medicare fiscal intermediary for defendant's hospital chain, identified defendant as receiving the highest amount of outlier payments in

relation to DRG payments. Information regarding defendant's outlier payments set in motion a full scale investigation that was underway by late-September, early-October 2002, long before the relators filed their complaint on November 12, 2002. Moreover, the information the relators purportedly provided to the FBI prior to the public disclosures in late-October 2002 had nothing to do with the institution of the Government's investigation of defendant's outlier payments. In short, the relators have had zero impact on the Government's pending outlier investigation.

## I.   RELATORS' OUTLIER CLAIMS ARE BASED UPON PUBLICLY DISCLOSED ALLEGATIONS

### A.   Relators' Claims Were Publicly Disclosed By the Defendant

Defendant accurately details certain public disclosures that took place prior to relators' filing their complaint on November 18, 2002. In particular, defendant identified the UBS Warburg Global Equity Research report authored by Kenneth Weakley dated October 28, 2002, 9 newspaper articles relating to defendant's outlier issues dated October 29- November 14, 2002, and 2 complaints (Taub v. Tenet Healthcare Corp., filed November 1, 2002, and Second Amended Complaint in In re Tenet Healthcare Corp. Securities Litigation, filed January 15, 2004)[3]. Def. Req. For Jud. Notice, Ex. 1-12. The Government submits, however, that there were two additional public disclosures that disqualify relators' outlier allegations.

On November 6, 2002, defendant, Tenet Healthcare Corporation, issued a press release regarding an audit by the U.S. Department of Health and Human Services of its outlier payments. That press release also provided the details of a conference call scheduled for the next day to discuss defendant's outlier payments. *Press Release*, November 6, 2002 (Attached as Exh. 1). On November 7, 2002, defendant held a public conference call to discuss outlier payments, among other issues.

---

[3]     The complaint in In re Tenet Healthcare Corp. filed on January 14, 2004 consolidated at least 9 complaints against Tenet that were filed before November 18, 2002.

During that call, defendant's Chairman and Chief Executive Officer, Jeffrey Barbakow, made the following statements regarding these payments at defendant's facilities:

> "We have been aggressive in our pricing. It has been a key part of our operating strategy, but in recent weeks it has come to my attention the effect this strategy has had in certain markets and its real impact on outlier payments." *Tenet Healthcare Conference Call to Discuss Outliers - Final*, 2002 WL 100547457 at *1 (Attached as Exh. 2).

> "The formulas used to calculate outlier payments are impacted by gross charges. In some cases, particularly aggressive pricing strategies resulted in increasing outlier payments." Id. at 2.

> "Although Medicare does not pay gross charges, charges are used in the outlier calculation. This resulted in unusually high outlier payments to certain Tenet hospitals." Id.

> " . . . the principle driver of our unusual outlier payments has been aggressive pricing . . ." Id. at 3.

> "All the questions about our outlier payments in the past two weeks have raised questions about whether Tenet hospitals obeyed the rules governing Medicare." Id. at 6.

As the statements from the press release and this public conference call on November 7, 2002 illustrate, information about defendant's alleged outlier abuses was widely disclosed by the defendant itself prior to the filing of relators' complaint on November 18, 2002. These disclosures, made in defendant's press release and during the course of a public conference call, fall within the FCA's definition of a media-related public disclosure. 31 U.S.C. §3730(e)(4)(A) (public disclosure occurs when information has been disseminated through "the news media").

### B.    Relators' Outlier Claims Are Based Upon The Defendant's Disclosures

In the Fifth Circuit, as in most circuits, allegations in a qui tam complaint are considered "based upon" publicly disclosed allegations if they are similar to the allegations that were publicly disclosed. See, U.S. ex rel. Laird v. Lockheed Martin Eng'g and Sci. Serv. Co., 336 F.3d 346, 352 (5th Cir. 2003) (qui tam complaint based on publicly disclosed information where allegations are based upon the same factual matters previously disclosed in state court filings). It need not be shown that the allegations in the complaint were derived from the public disclosure. Id.

Just like the public disclosures identified by defendant in its motion to dismiss, the disclosures made by the defendant itself in the press release and public conference call are similar to the allegations subsequently filed by the relators. To support the outlier allegations in their complaint, relators claim personal knowledge of defendant's "substantially higher profits than Southwestern" (the hospital where each of the relators is employed). Third Amended Complaint ("TAC") at ¶11. Relators further allege that Dr. Lam had personally seen "higher charges on Providence's and Sierra's charge master than he had seen at Southwestern." Id. The relators also state that when Dr. Meshel met with the FBI in "January or early February 20, 2002," he discussed "evidence of extremely high charges for certain DRGs." TAC at ¶14. These allegations mimic the statements made by defendant's own Chairman and CEO, Jefferey Barbakow, prior to the filing of relators' complaint. Thus, relators complaint is clearly based upon these public disclosures, as well as the other disclosures identified by defendant.

## II.    RELATORS ARE NOT THE ORIGINAL SOURCES OF THE INFORMATION ON WHICH THE PUBLICLY DISCLOSED ALLEGATIONS ARE BASED

To qualify as an original source and to thus overcome the public disclosure bar, a relator is required to possess direct and independent knowledge of the information on which the publicly disclosed allegations are based. U.S. ex rel. Reagan v. East Tex. Med. Ctr. Reg'l Healthcare Sys., 384 F.3d 168, 177 (S.D. Tex. 2003); Laird, 336 F.3d at 352. Additionally, a relator must voluntarily disclose that information to the Government. Since the relators' original source allegation directly relates to the Court's jurisdiction over this case, the relators bear the burden of proving their complaint meets these two requirements. As discussed below, relators here have failed to plead any facts, nor could they, showing their compliance with either requirement.

### A.    Relators Have No Direct and Independent Knowledge of Outliers

The Fifth Circuit has interpreted "direct knowledge" to mean "knowledge derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand

6

through the efforts of others." Laird, 336 F.3d at 355, (citing Webster's New International Dictionary

640 (3d ed. 1961)).  A relator's knowledge is considered "independent" if it is not derived from the

public disclosure.  Id. at 355.  Significantly, the Fifth Circuit has held that a relator must not merely

possess direct and independent knowledge of the information contained in his or her complaint, but

must possess direct and independent knowledge of the information on which the publicly disclosed

allegations are based.  Laird, 336 F.3d at 355.

Here, relators have failed to allege that they knew any of the information on which the

statements in defendant's conference call were based.  Likewise, they do not contend they had any

knowledge of the information underlying any of the other public disclosures identified by defendant.

Indeed, relators do not allege that they were even in a position to know this information.  Thus, relators

have failed to carry their burden of showing the type of direct and independent knowledge required to

qualify as original sources.

### B.   Relators Fail to Demonstrate That They Voluntarily Provided Sufficient Information to the Government Before Filing Their Qui Tam

The second prong a relator must satisfy to qualify as an original source is that he or she must

have voluntarily provided the information (that was publicly disclosed and for which he or she has

direct and independent knowledge) to the Government before filing a qui tam action.  Reagan, 384

F.3d at 177.  As defendant points out in its brief, other courts have held that a relator must disclose the

information to the Government prior to any public disclosure taking place.  Def. Mot. to Dismiss, p. 15,

citing U.S. ex rel. Findley v. FPC-Baron Employees' Club, 105 F.3d 675, 690 (D.C. Cir. 1997); U.S.

ex rel. McKenzie v. BellSouth Telecomm., Inc., 123 F.3d 935, 942 (6th Cir. 1997).

Here, as defendant correctly notes, there is a real question whether the relators in this case

provided any information regarding outliers to the Government before the first public disclosure on

October 28, 2002.  It is clear from a review of the relators' complaint that Dr. Meshel met frequently

with the FBI to discuss a number of other, unrelated qui tam cases he had filed.[4]  It is not clear when or if Dr. Meshel disclosed anything during these conversations regarding the defendant's alleged outlier abuse.  However, the Court need not resolve this issue.  Even if everything the relators claim that they told the FBI is true – which the United States disputes – relators' disclosures do not satisfy the voluntary disclosure prong.

First, although the Fifth Circuit has not addressed this issue, other circuits have held that in addition to coming to the Government, the relator must have been a source, directly or indirectly to the disclosing entity.  In other words, the relator must have caused the public disclosure.  See, eg., U.S. ex rel. Wang v. FMC Corp., 975 F.2d 1412, 1418 (9th Cir. 1992); U.S. ex rel. Dick v. Long Island Lighting Co., 912 F.2d 13, 16 (2nd Cir. 1990) (qui tam plaintiff "must have directly or indirectly been a source to the entity that publicly disclosed the allegations on which a suit is based").  We believe the Fifth Circuit would endorse this requirement, which is a natural extension of the Court's holding in Laird that a relator must have direct knowledge of the information underlying the public disclosure.  Moreover, such a rule makes sense by reserving any award for the one who actually caused the fraud to come to light.  See, Wang, 975 F.2d at 1420 ("While [the defendant] was silent, some other conscientious or enterprising person bravely brought the transmission problems to the attention of the media and the Army.  If there is to be a bounty for disclosing those troubles, it should go to one who in fact helped to bring them to light.").  Relators do not allege, nor is there anything in the various public disclosures indicating, that the relators played any role in bringing about the public disclosures.  Therefore, Relators do not, nor can they, allege any connection to the public disclosures.

Second, the relators must possess and disclose all of the elements necessary to support their allegations of fraud.  See e.g., U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante v. Prudential Ins. Co.,

---

[4]    Mr. Meshel is a serial relator who has filed numerous complaints under the False Claims Act.

944 F.2d 1149, 1160 (3rd Cir. 1991) (relator must possess substantive information about the particular

fraud, rather than merely background information which enables a putative relator to understand the

significance of publicly disclosed transaction or allegation).  The rationale for such a requirement is

clear: even if a voluntary disclosure to the Government takes place prior to the public disclosure, unless

that information is sufficient to put the Government on the trail of the fraud, the disclosure to the

Government is meaningless.  "If the minimum standard for obtaining relator status were set too low,

courts would have to accept jurisdiction over qui tam suits brought by complainants who had provided

only a soupcon of information to the government, as long as that soupcon somehow led the government

down an investigative trail resulting in public disclosure of fraud." U.S. ex rel. Detrick v. Daniel F.

Young, Inc., 909 F.Supp. 1010, 1021-22 (E.D. Va. 1995).  As the court in Detrick further stated,

> ". . . [The complainant] went to the government and said, "I think there's
> something fishy going on in connection with Government Contract A and
> Contractor B.  This is not enough to file a fraud complaint, and it is not enough
> to earn qui tam status. . . Allowing him to serve as a relator in the action . . .
> would be tantamount to encouraging citizens to initiate parasitic lawsuits feeding
> entirely off government information, or to run to the government with only a
> suspicion of fraud in the hope that they might later be able to win relator status
> by riding piggyback on information subsequently developed by a government
> investigation.  Although the qui tam provisions of §3730 are designed to
> encourage citizens with actual knowledge of fraud to come forward, they are
> plainly not designed to result in government agencies pursuing fishing
> expeditions at the behest of suspicious citizens.  Moreover, the FCA is not
> designed to have the government function as a sort of free private investigator to
> help persons achieve qui tam relator status and the resulting opportunity for
> financial gain."

Id.  The relators here are no different than the relator in Detrick, who did little more than tell the

Government "that there's something fishy going on."  That is not sufficient to satisfy the voluntary

disclosure requirements.

The relators' complaint makes vague representations about their contacts with the FBI prior to

filing their complaint.  Relators state, "[i]n January or early February 20, 2002, Dr. Meshel met with

FBI agents . . . to discuss his observations of Tenet's charging practices.  He related what he and Dr.

Lam had found both with respect to payment of kickbacks. . . and evidence of extremely high charges for certain DRGs." TAC ¶14. Relators further allege that, "[o]n or about April 16, 2002, Dr. Meshel met again with FBI Agents . . .," and that "Dr. Meshel again explained Tenet's misuse of medical director fees and the overcharges associated with certain DRGs." TAC ¶16. Relators' own description of these alleged meetings with the FBI makes clear that, at most, relators discussed defendant's pricing strategies, not anything about defendant's costs. Relators provide additional representations of meetings they allegedly had with the Government prior to filing their complaint (e.g., TAC ¶¶ 16-21), but again nowhere do the relators ever contend that they knew, much less disclosed, anything about defendant's costs or how they related to defendant's charges.

Relators' failure to disclose anything about defendant's costs is fatal to their claims to be the original sources. It is not illegal to have high charges. Indeed, Medicare has specifically stated that it does not control what a hospital can charge its patients. See Provider Reimbursement Manual, § 2203 ("[T]he Medicare program cannot dictate to a provider what its charges or charge structure may be."). As noted, only if a hospital's charges are not reasonably related to the hospital's costs will the hospital's outlier payments be problematic. Accordingly, one must know something about a hospital's costs to know whether the hospital has engaged in outlier fraud. Because the relators by their own admission did not disclose anything about defendant's costs, the statements that the relators claim they made to the Government prior to the public disclosure were insufficient to support any claim of outlier fraud and thus failed to satisfy the voluntary disclosure requirement.

## CONCLUSION

The relators' complaint is based on prior public disclosures, and relators do not satisfy the original source exception. Thus, relators' complaint should be dismissed and relators should not be permitted to

share in any proceeds that may result from the Government's pending investigation of defendant's outlier

payments.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

MICHAEL F. HERTZ
MICHAEL D. GRANSTON

RACHEL B. IRISH
Attorneys, U.S. Department of Justice
Civil Division
Post Office Box 261
Ben Franklin Station
Washington, D.C.
Tel: (202) 307-5928
Fax: (202) 514-0280

JOHNNY SUTTON
UNITED STATES ATTORNEY

MITCHELL L. WEIDENBACH
Assistant United States Attorney
Texas Bar No. 21076600
601 N. W. Loop 410, Suite 600
San Antonio, Texas 78216
Tel:   (210) 384-7360
Fax:  (210) 384-7312

ATTORNEYS FOR THE
UNITED STATES OF AMERICA

Dated: April 27, 2006

## CERTIFICATE OF SERVICE

This is to certify that copies of the foregoing Statement of Interest have been served by Federal

Express, next-day delivery and by email, this 27th day of April 2006, on:

>       Antonio V. Silva
>       Antonio V. Silva, P.A.
>       2616 Montana
>       El Paso, Texas 79903
>
>       *Attorney for Relator*
>
>       Joseph L. Hood, Jr.
>       Scott, Hulse, Marshall, Feuille,
>         Finger & Thurmond, P.C.
>       P.O. Box 99123
>       El Paso, Texas 79999-9123
>
>       *Attorney for Defendant*

and by Federal Express on:

>       Philip Michael
>       Troutman Sanders LLP
>       405 Lexington Avenue
>       New York, NY 10174
>
>       Mark Nagle
>       Troutman Sanders LLP
>       401 Ninth Street, NW
>       Suite 100
>       Washington, DC 20004-2134
>
>       *Attorneys for Relator*
>
>       Roger Goldman
>       Latham & Watkins
>       555 Eleventh St., N.W., Suite 1000
>       Washington, D.C. 20004

Katherine A. Lauer
Latham & Watkins
600 West Broadway, Suite 1800
San Diego, CA 92101

*Attorneys for Defendant Tenet*


Rachel B. Irish