IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA *ex. rel.*** | § | |
| **Dr. Man Tai Lam, Dr. William Meshel,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | EP-02-CA-525-KC |
| | § | |
| **TENET HEALTHCARE CORP.,** | § | |
| | § | |
| **Defendant.** | § | |

## ORDER

On this day, the Court considered "Defendant Tenet Healthcare Corporation's Motion for Summary Judgment" ("Tenet's Motion") and "The United States' Motion for Summary Judgment on the Ground that the Court Lacks Jurisdiction Over the Relators' Outliers [sic] Allegations" ("Government's Motion"). For the reasons set forth herein, Tenet's Motion is **GRANTED** and the Government's Motion is **GRANTED**.

### I.   BACKGROUND

The instant case is a *qui tam* action brought by Doctors William Meshel ("Dr. Meshel") and Man Tai Lam ("Dr. Lam") (collectively "Relators"), on behalf of the United States of America ("Government"), against Defendant Tenet Healthcare Corporation ("Tenet"), with the Government as intervenors, for alleged violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA").

####    A.   The Outlier System

In most cases, Medicare reimburses hospitals a fixed amount of money for each patient stay as a result of the Diagnosis Related Group ("DRG") assigned to the patient, based upon his

or her diagnosis and the procedures that the hospital has performed. United States' Statement of Interest 2. Generally, the amount that hospitals receive from the Medicare program for treating patients does not vary with the cost of treating the patient. *Id.*

In certain circumstances, however, the Medicare program supplements DRG payments in light of the hospital's cost of care. *Id.* In order to ensure that hospitals have an incentive to treat patients whose care requires unusually high costs, the Medicare program will use a portion of the Medicare Trust Fund for certain "cost outlier" cases. *Id.* at 2-3.

In Title 42 U.S.C. § 1395ww(d)(5)(A)(i-iv), Congress authorized the Centers for Medicare and Medicaid Services ("CMS") to make additional payments beyond the standard Medicare reimbursement amounts ("cost outlier payments") when a hospital's approximate "marginal cost of care" exceeds a particular threshold. 42 U.S.C. § 1395ww(d)(5)(iii). Due to the difficulty of directly determining a hospital's precise costs for an individual service, Congress instructed CMS to take a hospital's charges for an inpatient stay and adjust those charges in order to approximate the hospital's costs for that stay. 42 U.S.C. § 1395ww(d)(5)(ii).

CMS' outlier regulations implemented Congress' directives in the statute. Prior to August 2003, these regulations provided that a hospital was entitled to outlier payments where its charges, adjusted to cost, exceeded a specified cost threshold. 42 C.F.R. §§ 412.80, 412.84. To adjust a hospital's charges to costs, the regulations required the hospital's charges for an inpatient stay to be multiplied by the hospital's ratio of costs to charges from its most recently settled cost report. Because it takes at least two or three years for a hospital's cost report to be settled, CMS multiplied a hospital's current charges by the hospital's cost-to-charge ratio derived from a cost report for a time period two or three years in the past. *Id.* Accordingly, if a hospital substantially

increased its charges without a corresponding increase in costs, the inflated charge, when multiplied by the hospital's historical cost to charge ratio, led to an artificially high estimate of the hospital's "costs."

To determine whether a hospital is receiving excessive outlier payments, one must know about both the hospital's charges and its costs. Additionally, one must know not only that a hospital had high charges, but that its charges are increasing. During the relevant time frame, the key to an outlier payment scam is a rapid increase in charges, without a corresponding increase in costs, precisely to take advantage of the so-called "time lag" vulnerability that existed in the outlier laws prior to August 2003, when the regulations were amended. Since the hospital's current charges would have been multiplied by a cost to charge ratio that was at least two or three years old, an intentional and sudden increase in charges relative to costs would have resulted in services appearing to be more costly than they actually were – and thus the receipt of improper outlier payments.

**B.    Facts and Procedure**

Doctors Meshel and Lam are both licensed physicians who have practiced medicine in El Paso, Texas since 1998 and 1979, respectively. Fourth Am. Compl. ¶¶ 4-5, 8-9 ("FAC"). Throughout their careers, Drs. Meshel and Lam have either maintained privileges and/or held appointments at numerous El Paso area hospitals, including Providence Memorial Hospital ("Providence"), Sierra Medical Center ("Sierra"), and Del Sol Medical Center ("Del Sol"). *Id.* ¶¶ 8-10. In fact, Dr. Lam served on the Medical Executive Committee of Providence, which is the

highest governing body for the medical staff there.[1]  *Id.* ¶ 10.

Tenet operates and maintains both Providence and Sierra.  *Id.* ¶ 7.

Relators allege that, by virtue of Dr. Lam's management positions at Providence and Sierra, Dr. Lam knew that Providence and Sierra were earning substantially higher profits than Southwestern.  Third Am. Compl. ¶ 11 ("TAC").  They allege that Dr. Lam knew that Tenet hospitals listed much higher charges on their charge master (the hospital's published list of fees for various services) than Southwestern, even though the Government generally reimburses a fixed amount for Diagnosis Related Groups ("DRGs"), irrespective of the figure stated on the charge master.  *Id.*  Though Dr. Lam had been briefed on the outlier component of the Medicare reimbursement system, he did not immediately recognize how increases in charge master prices affected reimbursement for outliers.  *Id.* ¶ 12.

In a declaration signed on May 10, 2007, Lam states that in December of 2001 or January of 2002, he met with Meshsel in the physician's lounge of Del Sol Hospital to exchange information about possible fraud occurring in Tenet hospitals.  App. to the Relators' Combined Summ. J. Resp., Ex. 1 ¶ 7 ("Lam Decl.").  Lam declares that at that time, he believed Tenet was "engaged in some sort of illegal or unethical practice because the charges to patients were outrageously high compared with the other hospitals in the El Paso area."  *Id.* ¶ 8.  He declares that he received education related to the DRG Prospective Payment System and was "extremely puzzled" by Tenet's attitude toward the length of patient stays and Tenet's practice of aggressively marketing for neurosurgical and cardiovascular surgeries.  *Id.*

---

[1]  Currently, he holds an ownership interest in, and is a managing partner, Chairman of the Board, and Chief of Staff at, Southwestern General Hospital ("Southwestern"), a competitor of Tenet.  FAC ¶ 9.

Lam also makes various claims that he became suspicious of Tenet's practices when: (1) his clients complained to him about their high medical bills from Tenet; (2) he recommended that Southwestern follow Tenet's lead and increase its charges but was told that such increases were not recommended; and (3) he spoke with patients and observed various business aspects of Tenet while making rounds at Providence and Sierra. *Id.* ¶¶ 10-11, 13. He claims that he met with Meshel more than 100 times between January 2002 and October 2002 to discuss their investigation into Tenet, and that he believes Meshel relayed this information to the FBI. *Id.* ¶¶ 9, 15.

In a declaration dated May 11, 2007, Meshel, who claims to have served as a voluntary, unpaid informant and consultant for the El Paso Office of the FBI since the death of his wife in 2001, states that he began meeting with Lam in January 2002 to discuss Tenet's potentially fraudulent practices. App. to the Relators' Combined Summ. J. Resp., Ex. 2 ¶ 7 ("Meshel Decl."). He declares that between January 2002 and October 2002, he observed that Tenet charged Medicare patients an unreasonably high amount, which amount only increased every year. *Id.* ¶ 8. He claims that he was aware of this overcharging because he worked at Tenet facilities, heard complaints by patients, and discussed overcharge issues with doctors. *Id.*

Meshel declares that he reported his findings to FBI Special Agent Steve Sylvester on February 17, 2002 via telephone. *Id.* ¶ 10. He declares that the following day, February 18, 2002, he met with Agents Sylvester and Robin Skillington at the FBI office in El Paso. *Id.* ¶ 11. During this meeting, he claims to have reported his findings of Tenet's potential fraud, including its charges for certain services performed and supplies utilized in treating patients' DRGs, reimbursed by Medicare and which were unreasonably high compared with the charges of other

5

hospitals in the El Paso area. *Id.* He claims that at this time, Agent Skillington suggested that he consult with FBI Special Agent Thomas Murray because Agent Murray had handled major healthcare fraud cases and thus had some expertise in this area. *Id.*

Meshel claims that after some weeks, he and Lam met with Agents Sylvester, Skillington, and Murray to relay more information about Tenet's allegedly fraudulent practices. *Id.* ¶ 12. Between February 2002 and October 2002, Meshel claims that he and Lam reported all of their information to FBI Agents Sylvester, Skillington, and Murray. *Id.* ¶¶ 9, 14. He also claims that he became intimately familiar with the outlier system through David Buchmueller and shared all of this information with the FBI between February 2002 and September 2002. *Id.* ¶¶15-19.

Meshel declares that in April or May of 2002, he received a phone call from either an FBI or "HHS" Agent in Los Angeles. *Id.* ¶ 20. He claims that this agent explained that his colleagues in El Paso had referred him to Meshel because of his knowledge of abusive outlier practices, and further requested input regarding the Government's investigation into Tenet. *Id.* Meshel claims that he relayed the same information to this agent as he had to Agents Sylvester, Skillington, and Murray. *Id.*

On November 18, 2002, Drs. Lam and Meshel filed a *qui tam* action on behalf of the United States, alleging two causes of action. First, Relators alleged that "Tenet improperly manipulated the [o]utlier system by artificially inflating its charges when its real costs remained constant or even declined," thereby improperly manipulating payments from the Medicare/Medicaid system. TAC ¶ 31. Second, Relators alleged that Tenet developed a "kickback scheme," whereby it offered remuneration in the form of medical directorships at Tenet and reimbursement of office expenses to physicians who referred patients to Tenet hospitals.

FAC ¶ 29. Relators have filed a total of four disclosure statements in connection with their claims. In July 2005, the Government formally indicated its intent not to intervene in the suit. Thereafter, Relators pursued this case on their own.

On June 29, 2006, the United States finalized a global settlement with Tenet, resolving allegations that Tenet had improperly received outlier payments from Medicare and other federal health care programs, among other things. Tenet's Req. for Judicial Notice, Ex. 1.

On March 28, 2007, this Court issued an order denying Tenet's and the Government's motions to dismiss the outlier claim but granting Tenet's motion to dismiss the anti-kickback claim. Now pending before this Court are Tenet's and the Government's motions for summary judgment as to Relators' remaining claim – the outlier claim.[2]

---

[2] In their pleadings, Relators complain about their inability to conduct discovery and argue that this Court cannot grant summary judgment without allowing the parties to conduct discovery. This Court is almost at a loss to respond to these comments, but will attempt to do so briefly here.

As an initial matter, the first complaint was filed on November 18, 2002 – almost five years ago – which is four more years than this Court traditionally allows for civil cases. Granted, by its very nature this case presents special circumstances, but such circumstances have been consistently considered by this Court as detailed below.

First, this case has been active since at least February 27, 2006, when Relators finally served the complaint and Tenet filed a motion to dismiss the case. At this point, all pertinent parties – Relators, Tenet, and the Government – were aware of the allegations and had decided whether to go forward with the complaint, answer/file a motion to dismiss, and/or intervene. This means that the parties had over a year to conduct all relevant discovery.

Second, this Court notes that in response to an order to show cause why the Court should not dismiss Relators' complaint for Relators' failure to timely serve their complaint, Relators represented that "[d]uring the time since the [Government's notice of an intent not to intervene in the case], there has been much action on this case and the plaintiffs readied a trial team awaiting the decision of the Court on the declination." The Court is left to ponder the accuracy of Relators' statement that "there has been much action on this case," in light of Relators' current complaints that they have not had adequate time to conduct or even begin discovery.

In the Relators' Fourth Amended Disclosure Statement, Relators stated that they had learned that Tenet over-billed Medicare and Medicaid. Govt's Mot., Decl. of Rachel B. Irish, Ex. 4 ¶ 12 ("Fourth Disclosure Statement"). Relators stated that Tenet billed substantially higher charges than most hospitals for certain diagnoses, even though hospitals get paid essentially the same amount for certain diagnoses by Medicare. *Id.* ¶ 13. Relators stated that the payment for long term stays at Tenet hospitals and the use of inflated, higher diagnoses numbers allowed Tenet to gain substantially higher reimbursement on patients that stayed longer than 21 days. *Id.* ¶ 14. Relators stated that Tenet's outlier charge was many times the percentage of total revenue that comparable hospitals received. *Id.*

---

> Finally, and importantly, this Court issued a clear scheduling order on May 16, 2006, ordering a discovery deadline of July 19, 2006, which this Court later extended, by request of the parties, to March 30, 2007. At no point, thereafter, did the Court receive a timely and justified motion to extend the discovery deadline. All parties were abundantly aware of the discovery deadline, and yet for some reason, all parties failed to undertake even a minimal amount of discovery. The Court can only assume that the parties did so in an effort to conserve resources while awaiting decisions on the multiple motions to dismiss filed before this Court. This Court went to great lengths to give thorough and fair consideration to all arguments presented to it, as evidenced by both of its orders on motions to dismiss which are at or near twenty pages in length. It did so with the assumption that the parties would, in turn, thoroughly and fairly conduct their case.
>
> As illustrated by the facts above, all parties in this case have been given more than ample opportunity to conduct discovery. For some reason unknown to this Court, they have completely dropped the ball. This includes the Government, which also argues for additional discovery time, as the Government has: (1) known of this case since its inception; (2) initially declined to intervene but nevertheless; (3) filed a "Statement of Interest" indicating its awareness of continued proceedings and involvement in this case; and (4) only at a very late date sought intervention in this case, providing it a cover to complain of an inability to conduct discovery. Any and all fault with discovery deadline problems lies fully and squarely with the parties to this suit.
>
> It goes without saying that to the extent Relators, and any party, seeks additional discovery time, all such requests are denied.

All parties admit that the information on which Relators base their outlier allegations was publicly disclosed prior to November 18, 2002, when Relators filed the instant complaint. Tenet's Proposed Undisputed Facts ¶ 1 ("Tenet's Prop. Facts"); Government's Proposed Undisputed Facts ¶ 7 ("Govt's Prop. Facts"); Relators' Resp. to Tenet Healthcare Corp.'s Proposed Undisputed Facts ¶ 1 ("Resp. to Tenet's Prop. Facts"); Relators' Resp. to the United States' Proposed Undisputed Facts ¶ 7 (Resp. to Govt's Prop. Facts"). All parties further admit that because Relators' outlier allegations were based upon publicly disclosed information, Relators are barred from bringing suit unless they are the "original sources" of the information, as defined under the FCA. Tenet's Prop. Facts ¶ 2; Govt's Prop. Facts 8; Resp. to Tenet's Prop. Facts ¶ 2; Resp. to Govt's Facts ¶ 8.

## II.  DISCUSSION

### A.  Standard

A summary judgment movant must show by affidavit or other evidence that there is no genuine issue regarding any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the nonmoving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Lavespere v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). Once the movant carries the initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).

Summary judgment is required if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED.R.CIV.P. 56(c)); *Celotex Corp.*, 477 U.S. at 322. In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.4 (1986).

### B.    Outlier Claim and the Original Source Requirement

The Government argues that Relators lack both direct and indirect knowledge of outlier fraud. Govt's Mot. 13. Specifically, the Government argues that Tenet hospitals would have received improper outlier payments only if: (1) Tenet hospitals' charges were rising, not just high; and (2) the charges were rising substantially faster than Tenet's costs. *Id.* Without knowing whether charges and costs were increasing and by what proportion, the Government argues, Relators could not know whether Tenet hospitals sought and received outlier payments to which they were not entitled. *Id.* The Government supports this argument by pointing to Relators' Disclosure Statements, which arguably fail to disclose any actual knowledge on the part of either Relator of the critical facts needed to establish outlier fraud. *Id.* at 14. The Government further argues that Relators did not have direct knowledge of fraud because, as they concede, they did not understand outliers until they had a conversation with an outside hospital administrator. *Id.* at 15. Finally, the Government argues that Relators cannot demonstrate that they voluntarily disclosed evidence of their direct knowledge to the Government before they filed their complaint

because they do not claim to have disclosed information to the FBI about Tenet's costs. *Id.* at 16.

Tenet echoes the Government in arguing that Relators have failed to allege any personal knowledge as to issues central its claims, including Tenet's costs, charges, the relationship between its charges and its costs over time, and the effect of this relationship on outlier payments, much less any information about the scienter of the relevant Tenet employees. Tenet's Mot. 9. Tenet further echoes the Government in arguing that Relators' knowledge of high prices alone is insufficient to constitute knowledge of fraud because knowledge of a hospital's current charges and its cost-to-charge ratio derived from historic costs is necessary to constitute knowledge of fraud. *Id.* at 10. Finally, Tenet argues that alerting the Government to possible fraud is insufficient to make a relator the "original source" of information after the United States Supreme Court's recent holding in *Rockwell Internat'l Corp. v. United States*, 127 S. Ct. 1397 (2007).

Relators respond to both motions, arguing that they have substantial knowledge of the charge and cost trends of Tenet hospitals, gained while serving in administrative positions in El Paso area hospitals. Mem. in Opp'n to the Mots. of Tenet Healthcare Corp. and the United States for Summ. J. 3. They cite to their own declarations in support of this position. *Id.* They also defend their disclosure Statement, conceding that it must contain "'substantially all material evidence and information' known to them about the alleged fraud," but asserting that this does not require that the Disclosure Statement make out a prima facie case. *Id.* Relators disagree with the Government's and Tenet's characterization of the importance of knowledge of costs, and argue that while cost-to-charge ratios are important, such information "has been put into the government's hands – indeed it was promulgated by the government – quite apart from the

Relators." *Id.* at 4.

The FCA prohibits false or fraudulent claims for payment to the United States and authorizes civil actions to remedy such fraud. 31 U.S.C. § 3729(a); *Rockwell*, 127 S.Ct. at 1403. Claims to remedy fraud may be brought by the Attorney General or by private individuals in the Government's name. 31 U.S.C. § 3730; *Rockwell*, 127 S.Ct. at 1403. In part, the FCA provides that:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A); *Rockwell*, 127 S.Ct. at 1403.

In other words, the FCA eliminates federal jurisdiction over actions that are based upon the public disclosure of allegations unless the action is brought by the Attorney General or a person who is an "original source" of the information. 31 U.S.C. § 3730(e)(4)(A); *Rockwell*, 127 S.Ct. at 1401. As this Court has already ruled and as the parties concede, the information on which Relators' allegations are based was publicly disclosed within the meaning of § 3730(e)(4)(A). As such, the only question remaining is whether Relators qualify as the "original source" of the information.

The FCA defines an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B); *Rockwell*, 127 S.Ct. at 1403. In other words, an "original source" is an individual who: (1) has direct and independent knowledge of the

12

information on which the allegations are based and (2) has voluntarily provided the information to the Government before filing an action under the FCA.  *Rockwell*, 127 S. Ct. at 1405.  The term "direct" requires "'knowledge derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others.'"  *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Facilities*, 384 F.3d 168, 177 (5th Cir. 2004).  The phrase "information on which the allegations are based" refers to the information on which the relators's allegations are based, and not to the information on which the publicly disclosed allegations that triggered the public-disclosure bar are based.  *Rockwell*, 127 S. Ct. at 1407.  The relevant allegations are the allegations in the original complaint as amended throughout the litigation history.  *Id.* at 1408.

  The United States Supreme Court recently spoke on the issue of what information is sufficient to satisfy the "original source" requirement in *Rockwell*.  *Id.* at 1409-10.  *Rockwell* involved the submission of fraudulent claims by Rockwell International Corp., which operated the Rocky Flats nuclear weapons plant in Colorado, to the Department of Energy (DOE) for compensation in the form of award fees based on the DOE's evaluation of Rockwell International Corp.'s performance in the areas of environmental, safety, and health concerns.  *Id.* at 1401.  Between 1980 and 1986, Stone worked as an engineer at the Rocky Flats plant, and at one point predicted that Rockwell International Corp.'s plan to create "pondcrete" – a mixture of toxic pond sludge and concrete – would not work because the equipment used to create the pondcrete would not properly remove sludge, leading to an unstable mixture that would later deteriorate and cause unwanted release of toxic waste into the environment.  *Id.* at 1401-02.  Notwithstanding this prediction, Rockwell International Corp. created concrete-hard pondcrete.  *Id.* at 1402.  In

13

March of 1986, Stone was laid off, and shortly thereafter, in October of 1986, insolid pondcrete blocks were discovered. *Id.* In 1987, Stone went to the FBI with allegations of environmental crimes, including his 1982 engineering report predicting that the pondcrete system would not work. *Id.* The FBI searched the Rocky Flats plant in 1989, and in 1992, Rockwell International Corp. pleaded guilty to 10 environmental violations, including the knowing storage of insolid pondcrete blocks. *Id.* at 1403. In 1989, Stone filed a *qui tam* action under the FCA. *Id.*

In March of 2007, the United States Supreme Court held that Stone's knowledge under these circumstances was insufficient to make him an "original source" of the information. *Id.* at 1409. First, the Supreme Court found that Stone had predicted failure of the pondcrete system in one way, i.e. inadequate equipment, and the system failed in another way, i.e. insolid pondcrete instead of solid pondcrete. *Id.* at 1409. Second, the Supreme Court found that Stone was not employed at Rockwell at the time the insolid blocks were found, and thus did not know that the pondcrete was insolid, that Rockwell International Corp. would fail to remedy the defect, that the insolid pondcrete leaked, and that Rockwell International Corp. had made false statements to the DOE about pondcrete storage. *Id.* at 1410. The Court made clear that Stone did not know that the pondcrete failed, rather, he predicted it. *Id.* Though the Court left open the possibility that a prediction could qualify as a direct and independent knowledge in some cases, it held that the prediction was insufficient for Stone. *Id.* It also made clear that a relator's misunderstanding of why a defect occurred would normally be immaterial as long as the relator knew that the defect "actually existed." *Id.*

The instant case is much like *Rockwell*. Like Stone, Relators had no first-hand knowledge of fraudulent claims submitted to the United States. Rather, Relators, like Stone, were suspicious

14

that fraudulent claims may have been submitted to the United States. Relators came to this conclusion, not after seeing Tenet's actual costs or actual submissions, but rather after listening to their clients' complaints and observing that Tenet's charges were generally higher than Southwestern's charges. Moreover, as Tenet and the Government note, Relators make only conclusory allegations regarding Tenet's costs and charges. At no point do Relators allege or prove knowledge of whether Tenet's charges were rising, whether Tenet was artificially raising its charges, whether the charges were rising in relation to the hospital's costs, and whether Tenet had knowledge that the claims it submitted were false – all of which are necessary components in a claim of outlier fraud. In fact, as Relators concede, they did not even know the implication of Tenet's costs on outlier submissions until their later discussion with Buchmueller. As such, Relators cannot be said to have had direct and independent knowledge of the information on which the allegations are based, and thus Relators cannot pass the public-disclosure bar.

Because the Court finds that Relators had no direct and independent knowledge of the information on which the allegations are based, it need not address whether Relators voluntarily provided the information to the Government before filing under the FCA. Accordingly, Tenet and the Government's motions should be granted.

### III. CONCLUSION

For the reasons set forth above, Tenet's Motion (Doc. No. 150) is **GRANTED** and the Government's Motion (Doc. No. 153) is **GRANTED**.

The clerk shall close the case.

**SO ORDERED.**

**SIGNED** on this 20th day of July 2007.

15

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE